UNITED STATES of America,
Plaintiff-Appellee,

v.

Rick Alan PAVELSKI, Thomas Michael
Rudolph, and John Walter Rudolph,
Defendants-Appellants.

Nos. 85–1551 to 85–1553, 85–1742
and 85–1743.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1985.

Decided April 21, 1986.

Rehearing and Rehearing En Banc
Denied June 3, and
July 10, 1986.

---

Christopher Ford & Alan D. Eisenberg, Robert Courtney, Courtney & Pled, Jeffrey A. Kaufman, Milwaukee, Wis., for defendants-appellants.

Jan Kearney, Asst. U.S. Atty. (Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER and WOOD, Circuit Judges, and GRANT, Senior District Judge.[*]

GRANT, Senior District Judge.

This appeal arises from convictions for two bank robberies. In the first, No. 84–CR–132, a jury found defendants-appellants guilty of the December 27, 1983 armed robbery of the Cudahy Marine Bank in Cudahy, Wisconsin, in violation of 18 U.S.C. §§ 2, 2113(a) and 2113(d). A fourth robber, Gray, pled guilty and testified against the appellants. The trial court sentenced defendants-appellants, Pavelski and Michael Rudolph, to twenty-five years' imprisonment and defendant-appellant, John Rudolph, to eight years' imprisonment. The trial court ordered each to make restitution in the amount of $27,995.

In No. 85–CR–18, a jury convicted Pavelski of the November 23, 1983 armed robbery of the First State Savings and Loan in New Berlin, Wisconsin, in violation of 18 U.S.C. §§ 2, 2113(a) and 2113(d), and Thomas Rudolph of simple bank robbery, in violation of 18 U.S.C. §§ 2 and 2113(a). The trial court sentenced Pavelski to twenty-five years' imprisonment, and Thomas Rudolph to twenty years' imprisonment, both sentences to run consecutively to the appellants' previous sentences. The trial court ordered each to make restitution in the amount of $3,000.

Before each trial, the appellants moved to suppress evidence taken from them prior to their arrests. Both trial judges denied these motions, and appellants challenge the denials. John Rudolph also challenges the trial judge's denial of his motion for severance. We affirm the convictions.

### Facts

The primary question in these appeals involves the evidence taken from the appellants when they were apprehenced in Portland, Oregon. The significant events leading to the appellants' capture follow.

On November 23, 1983, Pavelski, Thomas Rudolph and Gray, a co-defendant who testified pursuant to a grant of immunity for the instant armed robberies as well as two others, held up the First State Savings and Loan in New Berlin, Wisconsin. On December 27, 1983, those three, plus John Rudolph, held up the Cudahy Marine Bank in Cudahy, Wisconsin. The four fled and began a ten-month cross-country odyssey which took them to Illinois, Louisiana, Texas, Florida, Washington, D.C., back to Illinois, on to Arizona, Nevada, Montana, back to Nevada where they disposed of the weapons used in the Wisconsin armed robberies, on to California, Colorado, Nebraska,[1] South Dakota, North Dakota, back to Nevada, back to California and finally on to Oregon. The appellants and Gray spent most of the more than $80,000 that they had stolen from the Wisconsin banks.

At approximately 8:55 A.M. on October 6, 1984, the four were driving a car with Colorado license plates in Portland, Oregon. They made an abrupt right-hand turn which Deputy Sheriff Fitz of the Multonomah County, Oregon Sheriff's Department observed. The abrupt turn, the out-of-state plates and the four men in the car drew Deputy Fitz's attention. Deputy Fitz, an officer with fifteen years' experience, followed them in his patrol car. After noting that they were driving slower than the posted speed limit, the deputy discontinued his pursuit.

Deputy Fitz saw the car again in another location at approximately 10:28 A.M. He maneuvered his patrol car past the appellants' car in an effort to gain eye contact with one of them. None looked in his direction. Concluding that the lack of eye contact was unusual, Deputy Fitz turned around and began to follow the car. Deputy Fitz radioed for back-up help and began looking for a reason to stop the car. Before he found his reason, the appellants and Gray, of their own accord, pulled into a

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

[1.] Gray indicated that, in exchange for his testimony, the Government granted him immunity for a 1984 Omaha, Nebraska armed bank robbery.

parking lot. Deputy Fitz stopped his patrol car behind them, and another uniformed Deputy Sheriff pulled his patrol car along the right of them. Deputy Fitz had no suspicion that they had violated any laws.

Pavelski exited the driver's seat and walked to the front bumper of the car. Deputy Fitz approached Pavelski and asked where they had been. Pavelski answered that they had become lost while looking for a house in the Troutdale area where a girl named Donna lived. Pavelski explained that he was from Colorado and produced a Colorado driver's license bearing the name Michael Scruggs. The deputy asked Pavelski how long he had been in Portland and Pavelski answered that he had been there two or three weeks. By this time, a police officer from Fairview, a neighboring community, had joined the two sheriffs. The Fairview officer parked his patrol car twenty to thirty feet in front of the appellants' car.

Seeking corroboration for Pavelski's story, Deputy Fitz stepped back to the left rear passenger door and tapped upon the window. Thomas Rudolph lowered the window and, after being asked, responded that they had been in Portland for two or three days. As Deputy Fitz questioned Thomas Rudolph, he noticed that Gray, who was sitting on the other side of the rear seat, was becoming extremely nervous and was perspiring visibly despite the cool temperature. These circumstances caused Deputy Fitz to become concerned about his personal safety.

Deputy Fitz asked the passengers for identification. They told the deputy that their identification had been stolen the previous day. Gray indicated that he might have some identification in his suitcase in the trunk. Because of his concern for his safety and the safety of the other officers, Deputy Fitz accompanied Gray to the rear of the car and carefully watched him rummage through his bag. Gray found no identification and Deputy Fitz saw nothing unusual. Gray re-entered the car. Deputy Fitz asked Pavelski if the vehicle contained

any weapons. Pavelski answered that it did not.

While Deputy Fitz had no evidence that a crime had been committed, he did have a "gut feeling that things were real wrong." Transcript at 14–15, 29 (Feb. 4, 1985). As a result of that feeling, the deputy used his hand radio to signal a passing patrol car from Gresham, another neighboring community, which returned to join the other three officers in the lot. Also as a result of that feeling, Deputy Fitz had the appellants and Gray removed from their car one at a time, frisked, and placed in the rear of separate patrol cars from which they could not exit. Finally, not having reasonable suspicion that a crime had been committed but as a result of that gut feeling, Deputy Fitz searched the car. His search produced two Oregon and two Colorado license plates, a loaded Ruger M14 semi-automatic rifle, a loaded Smith and Wesson .357 caliber revolver, a pair of standard work gloves, two pair of yellow rubber gloves, radio guides containing the frequency of every police and fire department in the United States, a police scanner programmed to the frequency of Deputy Fitz's radio, three stocking caps with eye holes ripped into them, two pillow cases, the car's Colorado Vehicle Registration in the name of Michael Scruggs, maps of the Portland metropolitan area, yellow pages from the Portland phone book listing the savings and loan associations in the Portland area, and other incidental items.

After finding the weapons, Deputy Fitz arrested the appellants and Gray. The Government extradited them to Wisconsin where they stood trial for the two bank robberies. The trial courts admitted the evidence found in the search of their car in Portland. This evidence resembled the paraphernalia used in the Wisconsin bank robberies. Juries convicted them of the robberies and they appeal.

*Issues*

The appellants raise one issue:

I. Whether the trial court should have suppressed the evidence taken from the appellants' car in Portland?

John Rudolph raises a separate issue:

II. Whether the trial court abused its discretion in denying John Rudolph's motion for severance?

### I. Whether the trial court should have suppressed the evidence taken from the appellants' car in Portland?

In their Motion to Suppress, appellants invoked the exclusionary rule to prevent the use of the seized evidence which they contend was taken in violation of the fourth amendment. The trial court found that the search was justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and denied the motion.

The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure....

... [T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures....

*United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). This Court must consider whether the instant search and seizure was unreasonable.

"Not all police questioning of citizens implicates the Fourth Amendment." *United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985) (citing *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983)), *cert. denied*, —— U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *see also United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984). In determining the threshold ques-

tion of whether or when an individual is seized, this Court applies an objective test. Stated quite simply, " 'a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Borys*, 766 F.2d at 308 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). Factors relevant to this determination include "the conduct of the police, the person of the individual citizen, and the physical surroundings of the encounter." *Id.* at 309 (citing *United States v. Morgan*, 725 F.2d 56, 59 (7th Cir.1984); *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983)).

■ In the instant case, the encounter occurred in a small parking lot slightly removed from a public road. Pavelski voluntarily stopped the car there, and Deputy Fitz parked his patrol car behind the appellants' car. A second Deputy Sheriff pulled his car along the passenger side of appellants' car. Pavelski voluntarily exited the car and Deputy Fitz approached him near the left front bumper. Deputy Fitz asked Pavelski where they had been, from whence they had come and how long they had been in Portland. Pavelski answered these questions and produced some identification. Up to this point, the circumstances could not have caused a reasonable person to feel restrained. Pavelski could have declined to answer the questions and driven away the car and its passengers. Before Deputy Fitz questioned the car's passengers, however, a Fairview police officer parked his car twenty to thirty feet in front of appellants' car. A reasonable person in this situation, bounded on three sides by police patrol cars, would not have believed that he was free to leave. Indeed, we wonder whether appellants could have maneuvered their car out of the parking lot in this situation. The encounter had become

a detention which did not exceed the boundaries of an investigatory stop.[2]

■ Having determined that the encounter became an investigatory stop, we must now inquire into the justification for that stop. *Borys,* 766 F.2d at 310. "Thus the question we must answer is whether the officers had a reasonable, articulate suspicion of criminal activity—the standard of justification for investigatory stops." *Cordell,* 723 F.2d at 1285 (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975)); *United States v. Denney,* 771 F.2d 318, 321 (7th Cir.1985). This Court uses a totality of the circumstances test in deciding whether the officer's suspicion was reasonable. *Denney,* 771 F.2d at 321.

■ Deputy Fitz articulated the following facts to support his suspicions at this point in his investigation: a car bearing out-of-state license plates and carrying four men made a sharp right-hand turn and the failure of any of the passengers to make eye contact with him later in the day. After questioning Pavelski, the deputy knew that Pavelski was from Colorado, had become lost looking for a house in Troutdale and had been in Portland for two or three weeks. Pavelski also produced a valid Colorado driver's license.

■ This Court finds that Deputy Fitz failed to articulate any objective facts indicating criminal activity. At a bare minimum, this Court needs some objective fact showing some type of illegal activity. *See, e.g., Denney,* 771 F.2d 318 (law enforcement officers had reasonable, articulable suspicion justifying search of defendant's vehicle where officers had already found weapons and drugs on property pursuant to warrant, and defendant approached at high rate of speed, made furtive gestures and refused to cooperate); *United States v. Davies,* 768 F.2d 893 (7th Cir.), *cert.*

*denied,* —— U.S. ——, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985) (investigatory stop of defendant outside his girl friend's apartment justified where FBI agents had reason to believe that both were involved in jewelry robbery and defendant denied knowledge of girl friend); *United States v. Longmire,* 761 F.2d 411 (7th Cir.1985) (police officers conducted valid protective search of car where they had objective belief that defendant and companion were armed and wanted in connection with an aggravated assault); *United States v. Vanichromanee,* 742 F.2d 340 (7th Cir. 1984) (DEA agents' investigatory stop justified where they knew that heroin had been sent to defendant's acquaintance from Thailand, that postal inspector had seen an oriental opening a package containing heroin, that DEA agent had seen defendant talking on phone in acquaintance's apartment, that defendant's passport showed his recent arrival in United States from Thailand, and that recent arrival from Thailand had taken packages containing heroin); *United States v. Posey,* 663 F.2d 37 (7th Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982) (observing defendant and companion drive past a recently robbed bank several times does not constitute reasonable, articulable suspicion); *United States v. Rainone,* 586 F.2d 1132 (7th Cir.1978), *cert. denied,* 440 U.S. 980, 99 S.Ct. 1787, 60 L.Ed.2d 239 (1979) (police officers' investigatory search of defendant's car justified where defendant drove car without lights in pizza parlor parking lot, defendant was parlor owner's nephew, and owner of parlor was involved intra-family feud in which threats of violence had been made). Deputy Fitz based his investigatory stop and search on his "gut feeling that things were real wrong." An investigating officer's subjective good faith, inarticulate hunches and inchoate and unparticularized suspicion may not form the basis for an investigatory stop. *Den-*

**2.** The trial judge never made a specific finding of fact regarding whether a reasonable person would have felt free to terminate the questioning. This Court reiterates the suggestion that it made in *Borys,* 766 F.2d at 310 (citing *United States v. Notorianni,* 729 F.2d 520, 523 (7th Cir.1984)), that such a finding ought to specifically be made by the district judge. Because the facts of the instant case are clear, we may appropriately evaluate them in light of the applicable case law. *Id.*

*ney,* 771 F.2d at 321; *Borys,* 766 F.2d at 308. The Government has the burden of establishing the reasonableness of an investigatory stop and accompanying search. *Longmire,* 761 F.2d at 417. They have failed to meet their burden in the instant case, and the trial court erred in admitting the evidence taken from appellants' car.

"A conviction tainted by constitutional error must be reversed unless the error is harmless." *Posey,* 663 F.2d at 41 (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). "In order to find an error of constitutional magnitude harmless the reviewing court 'must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *Harrison v. Owen,* 682 F.2d 138, 140 (7th Cir.1982) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828) (citations omitted). In general, a reviewing court must determine whether "'the minds of an average jury" would not have found the State's case significantly less persuasive had the [inadmissible evidence] been excluded.'" *Id.* at 141 (quoting *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972)).

■ Our review of the record in the present case leads us to conclude that the use of the evidence taken from the appellants' car in Portland was harmless error. The Government presented ample and overwhelming evidence, other than the evidence in question, linking the appellants to the respective bank robberies. In the trial for the robbery of the First State Savings and Loan, No. 85–CR–18, the Government presented the testimony of Gray, the getaway car driver in that robbery. Gray testified regarding the events leading up to the robbery, the attire of the robbers, and the getaway chase. Bank tellers and citizen witnesses corroborated Gray's testimony regarding the robbers' attire. A citizen witness identified Pavelski's voice at a lineup. Another citizen witness corroborated Gray's account of the getaway and identified the getaway car. Other witnesses testified about the identity and disposal of the getaway car which Pavelski had on loan

from his father-in-law. In view of the overwhelming nature of all the other evidence admitted against Pavelski and Thomas Rudolph, we conclude that the admission of the tainted evidence was harmless error.

Likewise, in the Cudahy Marine Bank robbery, No. 84–CR–132, the Government presented the testimony of Gray, a participant in the robbery. Gray, again the getaway car driver, testified about the planning of and preparation for the robbery. Gray detailed the attire of the robbers and their weapons. Gray described the getaway including an accident, the disposal of a car registered to John Rudolph's wife, the use and disposal of a car registered to Pavelski's wife, the disposal of the bank bags, the disposal of the robbery clothes and the purchase of new clothes. Finally, Gray related the ten-month cross-country journey of the four bank robbers. Bank tellers and citizen witnesses corroborated Gray's description of the robbers' attire and weapons. A series of witnesses traced appellants' flight from the bank to the car registered to John Rudolph's wife. One witness testified about the accident which occurred during the getaway drive and an expert linked plastic found at the accident site to the grill of the car registered to Mrs. Rudolph. Two witnesses recounted the group's transfer from Mrs. Rudolph's car to Mrs. Pavelski's car, and they identified Pavelski and Thomas Rudolph. The police found Cudahy Marine Bank coin wrappers in the abandoned Rudolph car. The police uncovered the bank bags buried by the side of the road between Cudahy, Wisconsin and Waukegan, Illinois. Finally, the police discovered a .12 gauge shotgun shell, four pairs of gloves similar to those used in the robbery, and an Ozark Airline deposit slip from the Cudahy Marine Bank, in Mrs. Pavelski's car which appellants had abandoned in Waukegan, Illinois.

In sum, we find the admission of the tainted evidence to have been harmless error "because there was more than sufficient evidence to support the verdict without it...." *United States v. Koopmans,* 757 F.2d 901, 905 (7th Cir.1985).

## II. *Whether the trial court abused its discretion in denying John Rudolph's Motion for Severance?*

On the morning of the trial, John Rudolph's attorney made a Motion for Severance. In part, John Rudolph's counsel based the motion on the availability of Pavelski, and possibly Thomas Rudolph, to offer exculpatory testimony in a separate trial. John Rudolph's counsel stated that the two would testify that John Rudolph was drunk and unconscious at the time of the robbery. After the trial court denied the motion, John Rudolph's counsel proposed to make a more detailed offer of proof, but did not specify what that offer would be. The trial court again denied the motion. Pavelski's counsel attempted to clarify John Rudolph's offer and added that Pavelski had stated that John Rudolph slept in the car and did not know about the robbery until the next day.

A "motion for severance is directed to the discretion of the district court, and we will reverse a defendant's conviction 'only upon a showing of clear abuse of that discretion.'" *United States v. Shue,* 766 F.2d 1122, 1135 (7th Cir.1985) (citation omitted); *see also United States v. Oglesby,* 764 F.2d 1273, 1275 (7th Cir.1985). "Appellants bear a heavy burden of showing that they have been prejudiced by the joinder and thereby denied a fair trial." *United States v. Andrus,* 775 F.2d 825, 846 (7th Cir.1985) (citation omitted). "In exercising its discretion the court should balance the interests of the defendant against the needs of judicial economy." *United States v. Tedesco,* 726 F.2d 1216, 1219 (7th Cir.1984) (citation omitted). "Further, in considering a motion for severance, the trial judge should give due deference to the strong public interest in having persons jointly indicted tried together, especially where the evidence against the defendants arose out of the same acts or series of acts." *United States v. Oxford,* 735 F.2d 276, 280 (7th Cir.1984) (citation omitted). When a defendant seeks a severance to avail himself of allegedly exculpatory testimony from a co-defendant, a trial court ought to consider three factors: "(1)

whether the co-defendant's testimony would be exculpatory; (2) whether the co-defendant would in fact testify; and (3) whether the testimony would bear on defendant's case." *United States v. Melton,* 689 F.2d 679, 686 (7th Cir.1982) (citations omitted). "The law in this circuit is well settled that review of the trial court's exercise of discretion in refusing a motion for severance 'must be based on the state of the record at the time of the motion.'" *Oglesby,* 764 F.2d at 1275 (citations omitted). Finally, we will reverse the denial of a severance "only for the most compelling factual situations." *Oxford,* 735 F.2d at 280 (citation omitted).

In the instant case, John Rudolph's and Pavelski's counsel merely detailed the supposed content of Pavelski's possible testimony. The trial court heard nothing from them or from Pavelski regarding his willingness to testify. While John Rudolph's counsel proposed to make a more detailed offer of proof, he never specified what its content would be. "The mere possibility of a codefendant's testimony has been found an insufficient grounds for severance in other cases." *Oxford,* 735 F.2d at 281 (citing *United States v. Harris,* 542 F.2d 1283, 1312–13 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *Byrd v. Wainwright,* 428 F.2d 1017, 1022 (5th Cir.1970); *United States v. Kahn,* 381 F.2d 824, 841 (7th Cir.), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 592, 19 L.Ed.2d 661 (1967)). In the absence of any support, such as an affidavit or recorded testimony from the co-defendant, *see Andrus,* 775 F.2d at 847, we find that John Rudolph was not prejudiced by the joinder of his trial with that of his co-defendants. Therefore, the trial court properly exercised its discretion in denying his Motion to Sever.

### Conclusion

The appellants' convictions are Affirmed.