# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-2693

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES C. HENDRICKS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 CR 105—**James T. Moody**, *Judge.*

ARGUED DECEMBER 6, 2002—DECIDED FEBRUARY 21, 2003

Before EASTERBROOK, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A jury convicted James C. Hendricks of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Mr. Hendricks to 188 months' imprisonment as an armed career criminal. *See* 18 U.S.C. § 924(e); U.S.S.G. § 4B1.4. Mr. Hendricks challenges both his conviction and his sentence. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.  Factual Background

At 5:42 a.m. on May 10, 2001, Millie McDonald, a newspaper carrier, called the Lowell, Indiana Police Department to report what she perceived to be suspicious activity. After furnishing her name and occupation, McDonald informed the police dispatcher that an occupied white car was parked behind the Oil Exchange on Route 2. That business was closed at that hour of the morning. McDonald stated that she initially had observed the car parked behind the Oil Exchange facing east, that she had continued on her paper route, and that she had returned sometime later to find the same vehicle still parked behind the Oil Exchange, but this time facing west. The dispatcher immediately relayed McDonald's information to Officer John Swisher, who was present at the police station when the call was received.

Because the police station and the Oil Exchange are located within the same block on Route 2, Officer Swisher was able to respond to the call immediately. As Officer Swisher was leaving the police station, he observed a white car drive from behind the Oil Exchange, turn right onto Route 2, and then make a sharp right turn into a Mobile gas station. Officer Swisher observed that the white car failed to make a complete stop before pulling onto Route 2 and did not use a turn signal when leaving the Oil Exchange or entering the gas station. He also observed two occupants in the car and noticed that the passenger was moving about. The driver of the car was Marlissa Barnes and the only passenger was her fiancé, Mr. Hendricks.

Without activating his patrol car's emergency lights, Officer Swisher followed Barnes into the Mobile station and stopped his patrol car approximately fifteen feet behind where she had stopped her vehicle. There was nothing in front of the white car to prevent its exit. By the time Officer Swisher pulled into the Mobile station and stopped his car, Barnes had stopped, was out of the car and was rapidly approaching Officer Swisher's patrol car. Officer Swisher testified that it was unusual for a driver to approach him in such a manner. He further testified that his suspicions were elevated because her car had been parked behind a closed business establishment and there had been quite a few burglaries in the area during that time. For these reasons, Officer Swisher radioed for back-up.

Before a back-up officer arrived, Barnes engaged Officer Swisher in conversation. She told Officer Swisher that she was lost and looking for the interstate. When Officer Swisher asked her why she had been parked behind the closed Oil Exchange, Barnes avoided the question; she continued to state that she was lost and looking for the interstate. According to Officer Swisher, Barnes appeared nervous, her hands were shaking, and she kept looking back at her car as if something were wrong. Officer Swisher also noticed that Mr. Hendricks continued to move about the passenger side of the car and that Barnes was attempting to obstruct his view of Mr. Hendricks by repeatedly moving into his line of sight.

About a minute into Officer Swisher's conversation with Barnes, Officer Jeff Burk arrived at the Mobile station; the emergency lights of his patrol car were activated. Once Officer Burk arrived, Officer Swisher decided to approach the white car. As he approached, Officer Swisher noticed that Mr. Hendricks was slumped down in the

passenger seat so that his head was barely visible from the rear of the car. He further noticed that the lock on the passenger door was completely missing; it had been "spun off." Suppression Hearing at 56. Officer Swisher testified that this condition indicated a forced entry. Upon reaching Mr. Hendricks, Officer Swisher asked him if he could see some identification. At this point, Officer Swisher noticed that the key in the ignition was turned upside down and that the key was barely stuck into the ignition lock; he also noticed that wires and broken plastic were hanging from the steering column. Officer Swisher testified that these observations indicated to him that the vehicle had been stolen.

Mr. Hendricks told Officer Swisher that he had identification, but he did not produce it; instead, he kept reaching for something on the left side of his body in the seat. Because it appeared to Officer Swisher that Mr. Hendricks was having difficulty with something that the officer could not see, he became concerned for his safety and asked Mr. Hendricks to get out of the car. Officer Swisher then conducted a protective pat-down search of Mr. Hendricks' outer clothing and felt a metal object in the right pocket of his pants. From prior experience, the officer recognized the object as the magazine for a handgun. Having ascertained that the magazine was full, Officer Swisher asked Mr. Hendricks where the gun was and whether he had a permit. Mr. Hendricks did not tell Officer Swisher where the gun was, but he responded that he did not have a permit. Officer Swisher then handcuffed Mr. Hendricks for officer safety. While the car door was still open, Officer Swisher observed a fully loaded Lorcin nine-millimeter handgun on the floorboard but partially hidden beneath the passenger seat. The magazine in Mr. Hendricks' pocket fit this weapon.

Mr. Hendricks was placed under arrest. At the police station, Officer Swisher performed a more thorough pat-down of Hendricks; during this search, in the same pocket in which he previously had found the loaded magazine, the officer found a single loose bullet that matched the bullets in the magazine found in Hendricks' pocket and the bullets in the magazine recovered from the handgun. No fingerprints were recovered.

Both Mr. Hendricks and Barnes testified at trial. Barnes testified that, although she had pleaded guilty to auto theft in state court, she had not stolen the car, but rather had taken the car from a friend after it had been stolen. According to Barnes, she drove the stolen car from a party to her home in Gary sometime after 2:00 a.m. on the morning of May 10, 2001. She left the car running outside her home while she went inside to find Mr. Hendricks. At that point, Barnes and Mr. Hendricks began arguing, and Barnes went back to the stolen car. Mr. Hendricks followed her and positioned himself in the passenger seat. The two continued to argue, and Barnes drove off. She drove aimlessly until they ended up in Lowell.

Both Mr. Hendricks and Barnes testified that they did not know the handgun was in the car until they were in Lowell. However, ATF Special Agent David Coulson testified that, on the morning of May 10, Barnes told him that she and Mr. Hendricks were aware of the gun's presence in the car while they were in Gary. Mr. Hendricks and Barnes both admitted that, once Mr. Hendricks found the gun, which they testified was under the passenger seat, he held it in his hand. Mr. Hendricks testified that he had reached under the seat, found the handgun, picked it up and started screaming at Barnes for having a firearm in the car. He further testified that Barnes

grabbed the gun, that he took the gun back from Barnes, and that he placed it under the passenger seat. Mr. Hendricks testified that, shortly after placing the gun under the passenger seat, he got out of the car and used a pay phone that was located next to the Mobile station. According to Mr. Hendricks, he attempted to call his aunt to see if she could pick him up, but the aunt did not answer the phone. Mr. Hendricks testified that a few minutes went by, that he observed a police vehicle, and that he then decided to get back into the car.

**B. District Court Proceedings**

During trial, Mr. Hendricks objected to the district court's instruction on possession and submitted instructions on two theories of defense. The district court gave its own instruction over Mr. Hendricks' objection and refused to give either of Mr. Hendricks' instructions in its charge to the jury. On March 26, 2002, the jury convicted Mr. Hendricks of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On June 11, 2002, Mr. Hendricks was sentenced by the district court. Mr. Hendricks objected to a 2 level enhancement of his offense level for obstruction of justice and also a 2 level enhancement for an obliterated or altered firearm serial number. The district court denied Mr. Hendricks' objections and granted both of the enhancements. Mr. Hendricks also objected to the court's application of the Armed Career Criminal Act, 18 U.S.C. § 924(e), without having the issue presented to the jury. The district court denied Mr. Hendricks' objection and sentenced him as an armed career criminal under U.S.S.G. § 4B1.4. The court also denied Mr. Hendricks' request for a 3 level reduction for acceptance of responsibility. Mr. Hendricks was sentenced to a term of 188 months in prison.

## II

## DISCUSSION

### A. Fourth Amendment Challenge

Mr. Hendricks filed a motion to suppress the nine-millimeter handgun retrieved from the stolen car. Following a hearing, the district court denied the motion. The court determined that "there was no initial stop of the vehicle" and that subsequent events certainly gave Officer Swisher reasonable suspicion to conduct an investigatory stop. Continued Suppression Hearing at 48. Mr. Hendricks submits that the district court erred when it denied his motion to suppress. In reviewing a district court's decision on a motion to suppress, we review questions of fact for clear error and questions of law de novo. *See United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002).

Mr. Hendricks submits that, although the car already was parked at the Mobile station when Officer Swisher arrived, the car was "stopped" when Officer Swisher pulled in fifteen feet behind the parked car. Mr. Hendricks further contends that this stop violated the Fourth Amendment because it was not supported by reasonable suspicion. We cannot accept either of these contentions. We believe that the district court correctly determined that the initial encounter between Officer Swisher and the car's occupants was consensual and that no stop occurred until Officer Burk arrived at the Mobile station with his emergency lights activated. We also believe that, in any event, Officer Swisher had reasonable suspicion to make an investigatory stop as soon as he observed the white car pull out from behind the closed Oil Exchange. We shall address each of these issues.

**1.**

We believe that the district court correctly determined that no stop occurred within the meaning of the Fourth Amendment until Officer Burk arrived at the scene because, until that time, the encounter between Officer Swisher and the car's occupants was consensual. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).

It goes without saying that " 'not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Accordingly, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 122 S. Ct. 2105, 2110 (2002). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Id.* The test is whether "a reasonable person would feel free to terminate the encounter." *Id.* In making this determination, relevant factors include " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980)).

Consistent with the foregoing standard, this court has recognized that "in some circumstances a driver may stop his automobile on his own resulting in a consensual encounter." *United States v. Green*, 111 F.3d 515, 520 n.1 (7th Cir. 1997) (citing *United States v. Langston*, 970 F.2d 692, 697-98 n.3 (10th Cir. 1992) (finding a consensual encounter where a driver pulled over after an officer drove up alongside him and made eye contact, and the officer turned on his emergency lights for the first time after he parked on the shoulder)). However, this court consistently has held that an encounter is not consensual when a reasonable person would not feel free to leave. For this reason, the court in *Packer* held that police intervention amounted to a stop when the officers parked their vehicles both in front and behind the defendant's car with the "take down" light shining through the defendant's windows and an officer asked the occupants to put their hands in the air as she approached the car with a flashlight. *See Packer*, 15 F.3d at 657. Similarly, in *Green*, the court held that a stop had occurred when the officers pulled their car across the driveway and blocked the defendant's exit because a reasonable person would not have felt free to leave. *See Green*, 11 F.3d at 520 n.1.

This court's discussion in *United States v. Pavelski*, 789 F.2d 485 (7th Cir. 1986), upon which both Mr. Hendricks and the Government rely in support of their respective positions, further illustrates the distinction between a consensual encounter and a stop. In *Pavelski*, a police officer was following the defendants' car looking for a reason to stop the car when the defendants voluntarily pulled into a small parking lot slightly removed from the public road. The officer, without any suspicion that the defendants had violated any laws, parked his patrol car behind the defendants' car, and a second officer parked his patrol car along the side of the defendants' car. The driver

exited the car and walked to the front bumper. The officer then approached the driver and began asking him questions. During this conversation, a third officer drove up and parked his patrol car twenty to thirty feet in front of the defendants' car. At this point, the officer stepped back to the rear passenger door, tapped on the window and began questioning the car's passengers.

Based on these facts, this court determined that a seizure did not occur until the third patrol vehicle parked in front of the defendants' car because until that time, "the circumstances could not have caused a reasonable person to feel restrained." *Id.* at 488. The court explained that prior to the third officer's arrival, the driver "could have declined to answer the questions and driven away the car and its passengers." *Id.* Once the third officer parked his vehicle in front of the defendants' car, however, the consensual encounter became an investigatory stop because "[a] reasonable person in this situation, bounded on three sides by police patrol cars, would not have believed that he was free to leave." *Id.*[1]

The district court's determination in this case certainly was consistent with this case law. The district court's conclusion that the initial stop was consensual is firmly grounded in the record and reflects an accurate understanding of the applicable standard. The court was on solid ground in determining that Officer Swisher did not effectuate a stop when he parked his patrol car fifteen feet behind the stolen car. Barnes drove to the Mobile station and parked the car out of her own free will. Officer Swisher

---

[1] Notably, the court questioned "whether [the defendants] could have maneuvered their car out of the parking lot in this situation." *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986).

did not signal the car to pull over. When Barnes pulled into the gas station, Officer Swisher was approximately fifty feet behind the car. Although Officer Swisher followed the car into the Mobile station and stopped approximately fifteen feet behind it, there was nothing in front of the car to block its exit from the gas station. Officer Swisher did not activate his emergency lights when Barnes pulled into the gas station, nor did he shine a light on the car. By the time that Officer Swisher had pulled into the Mobile station and stopped his patrol car, Barnes had parked, was out of the car and was rapidly approaching Officer Swisher. Based on these facts, the district court properly determined that Officer Swisher's initial encounter with the occupants of the stolen car was not a seizure within the meaning of the Fourth Amendment; a reasonable person in these circumstances would not have felt restrained.

## 2.

In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Supreme Court held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop if the officer has a reasonable suspicion supported by articulable facts that "criminal activity may be afoot." "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations omitted). "To determine whether an officer's suspicion of criminal activity was reasonable, a court must evaluate the totality of the circumstances as they appeared to the officer at the time of the stop." *United States v. Ocampo*, 890 F.2d 1363, 1368 (7th Cir. 1989)

(citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). In making this determination, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Sokolow*, 490 U.S. 1, 10 (1989) (internal quotations omitted).

In this case, Officer Swisher was present when the police dispatcher received a call from Millie McDonald, a newspaper carrier, reporting what she perceived to be suspicious activity. McDonald informed the dispatcher that a white car was parked behind a closed Oil Exchange. McDonald further informed the police dispatcher that she initially observed the car parked behind the Oil Exchange facing one direction, that she continued on her paper route, and that she returned sometime later to find the same vehicle still parked behind the Oil Exchange facing the opposite direction. McDonald's call was not an anonymous tip. She clearly identified her name and occupation, and it was evident from her statement how she came to observe the white vehicle parked behind the closed business establishment.[2]

---

[2] In *Edwards v. Cabrera*, 58 F.3d 290 (7th Cir. 1995), a police dispatcher received a call from a dispatcher for PACE, a suburban Chicago public bus transit agency. The dispatcher reported that a PACE bus driver thought he had seen a drug transaction involving five black men. The dispatcher did not provide the police with the bus driver's name. In considering the reliability of the informant, the court determined that "[t]he bus driver was not anonymous." *Id.* at 294. The court reasoned that "while the police did not know his name, we can presume his identity was (and is) easily ascertainable by the officers" and "[t]he officers also knew his occupation." *Id.* Given these characteristics, the court determined that certain inferences could be drawn regarding the informant's reliability and that the bus driver "must

(continued...)

Immediately after receiving McDonald's information, Officer Swisher was able to respond because of the police station's close proximity to the Oil Exchange. As Officer Swisher was leaving the police station, he observed a white car drive from behind the closed Oil Exchange. At this point, Officer Swisher was able to verify the accuracy of McDonald's tip. Officer Swisher then observed the car turn right onto Route 2, without stopping before entering the road, and make a sharp right turn, without signaling, into the Mobile station. At this point, Officer Swisher also turned into the Mobile station and parked his patrol car fifteen feet behind the car that he was dispatched to investigate. Officer Swisher believed it was unusual for a car to be parked at that hour of the morning behind a closed business. He also knew that several businesses had been burglarized in the area.

We believe that these facts, viewed in their totality, provided Officer Swisher with reasonable suspicion to detain briefly the car's occupants in order to verify or dispel his well-founded suspicions that the occupants had been, or were about to be, engaged in criminal activity. *See Ocampo*, 890 F.2d at 1368 ("A *Terry* investigatory stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.").

We do not think that this court's decision in *United States v. Packer*, 15 F.3d 654 (7th Cir. 1994), requires a

---

[2] (...continued)
have appeared to the police as a citizen legitimately reporting what he believed to be criminal activity." *Id.* Like the bus driver in *Edwards*, McDonald must have appeared to Officer Swisher as a citizen legitimately reporting what she believed to be suspicious activity.

contrary result. In *Packer*, police responded to a citizen's telephone call reporting a "suspicious vehicle," described by the citizen as a yellow Cadillac with four black male occupants, parked alongside a residential street at 1:00 a.m. *Id.* at 655. Three police officers, in two vehicles, arrived on the residential street moments later, and found what they described as a "greenish" Cadillac with fogged over windows. *Id.* Two officers in a police van "pulled directly behind the Cadillac and activated the white 'take down lights' on top of the van to illuminate the Cadillac." *Id.* At the same time, a third officer pulled his patrol car in front of the Cadillac to prevent it from leaving. As one of the officers approached the Cadillac, she pointed a flashlight and asked the occupants to put their hands in the air where she could see them. During the course of this encounter, the police recovered a shotgun, and the defendant subsequently was charged with being a felon in possession of a firearm.

The court in *Packer* held that the shotgun should have been suppressed because the officers lacked reasonable suspicion to justify the investigatory stop. *See id.* The court reasoned that "[a]lthough the early morning hour undoubtedly adds to the reasonableness of the officers' suspicion that perhaps something unusual may have been afoot, the record does not suggest any specific irregularities in the car, other than the windows being all fogged up with the four individuals sitting inside." *Id.* at 658. The court further reasoned that "[w]hile the car had in fact been parked there for more than an hour, other than the opaque mist on the windows, no evidence shows that the officers were aware of how long the car had been parked." *Id.*

Although the court in *Packer* held that the officers lacked reasonable suspicion on the facts of that case, the

court also stated that "the minimum threshold of 'specific and articulable facts' sufficient to give rise to reasonable suspicion" is only "marginally" higher than those presented. *Id.* at 659. We believe that the facts before the district court in this case satisfy that higher threshold. The caller in *Packer* was anonymous. In contrast, McDonald identified both her name and occupation, an occupation that not only made her identity readily subject to verification, but that also made clear the reason why she had observed so closely the presence of the white car. Second, the caller in *Packer* did not indicate how long the car had been parked. In Mr. Hendricks' case, although McDonald did not provide the dispatcher with a precise length of time, she stated that she observed the car parked behind the Oil Exchange, continued on her paper route, and then observed the car again, still parked behind the closed business establishment. This account necessarily involved some lapse of time. In addition, McDonald reported that the car changed directions during the time that it was parked behind the Oil Exchange. Third, the car in *Packer* was parked along a residential street. In contrast, the car occupied by Mr. Hendricks and Barnes was parked behind a closed business establishment. Finally, the officers in *Packer* were not aware of any specific and recent criminal activity in the area, nor did the officers rely on the general level of the neighborhood's crime rate. In the present case, Officer Swisher testified that he knew there had been several businesses recently burglarized in the area. For these reasons, we believe that *Packer* does not control our determination in this case.

Indeed, given the distinctions between *Packer* and Mr. Hendricks' case, we believe that the Eleventh Circuit's decision in *United States v. Briggman*, 931 F.2d 705 (11th Cir. 1991), is more instructive. In *Briggman*, an experienced police officer was on routine patrol at approxi-

mately 4:00 a.m. when he noticed an occupied vehicle parked in a commercial lot shared by several business establishments. The officer was aware that numerous larcenies and robberies recently had occurred in the surrounding business establishments. For these reasons, the officer began cruising the parking lot. As the officer approached the defendant's vehicle for the second time, the defendant exited the parking lot, turned in front of the officer's vehicle and onto a major thoroughfare. The officer then stopped the defendant for further investigation. The court held that the stop was justified and reasoned that the officer's "suspicion reasonably was aroused when he noticed [the defendant] parked in a parking lot at 4:00 a.m. in a high crime area, when commercial establishments served by the lot were closed for the night." *Id.* at 709.

Subsequent to the initial encounter, which we have determined was consensual, a series of events unfolded that provided Officer Swisher with additional justification to make a stop. The officer testified that he observed Barnes' suspicious behavior, including her rapid approach, her nervous demeanor, her evasive responses to his question of why she was parked behind the Oil Exchange, and her efforts to block his view of the stolen vehicle and its passenger. When Officer Swisher approached the vehicle to ask Mr. Hendricks for identification, he noticed that Mr. Hendricks was slumped over so that his head was barely visible; that the lock on the passenger door was completely missing; that the key in the ignition was turned upside down and barely stuck into the ignition; and that wires and broken plastic were hanging from the lower section of the steering column. These facts certainly gave Officer Swisher additional reasonable suspicion that the car had been stolen.

Although Mr. Hendricks does not seriously contend that the encounter exceeded the permissible scope of a *Terry* stop, we note briefly that it did not. An officer is entitled to " 'ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.' " *United States v. Felix-Felix*, 275 F.3d 627, 633 (7th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). An officer also is entitled "to take reasonable steps to insure [his] own safety." *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002). An officer therefore may order the detainee to exit the vehicle, *see United States v. Davis*, 200 F.3d 1053, 1054 (7th Cir. 2000), and he may conduct a pat-down search of the detainee's outer clothing, *see Jackson*, 300 F.3d at 746.

Officer Swisher followed this course of conduct in his encounter with Mr. Hendricks. When Mr. Hendricks took an abnormally long time to comply with Officer Swisher's request for identification and appeared to be having difficulty with something that the officer could not see, Officer Swisher asked him to step outside of the car. Officer Swisher then conducted a protective pat-down of Mr. Hendricks' outer clothing and discovered a metal object in his pocket, which the officer knew from prior experience to be a magazine for a handgun. After Mr. Hendricks admitted that he did not have a gun permit, Officer Swisher handcuffed him for officer safety and saw a loaded handgun on the floorboard partially hidden beneath the passenger seat. At this point, Officer Swisher had probable cause to arrest Mr. Hendricks. Given the foregoing sequence of events, the district court properly denied Mr. Hendricks' motion to suppress.

**B. Jury Instructions**

Mr. Hendricks next submits that the district court's instruction to the jury regarding possession was erroneous. In particular, he argues that it was error for the district court to instruct the jury that momentary possession of the firearm was sufficient to convict. Mr. Hendricks also submits that the district court erred by refusing to give the theory of defense instructions that he tendered.

We review a district court's decision regarding jury instructions for an abuse of discretion. *See United States v. Kosth*, 257 F.3d 712, 717 (7th Cir. 2001); *United States v. Swanquist*, 161 F.3d 1064, 1075 (7th Cir. 1998). A jury instruction will not be disturbed on appeal if the instruction "fairly and accurately" summarizes the law and has "support in the record." *Kosth*, 257 F.3d at 717. However, we review a district court's decision not to instruct the jury on a theory of defense de novo. *See United States v. Irorere*, 228 F.3d 816, 825 (7th Cir. 2000).

In this case, the district court instructed the jury that:

> Possession of an object is the ability to control it. Possession exists when an individual holds an object, in this case a firearm, even if the handling is only momentary, as long as the individual does so knowingly and intends to handle the object. Possession may also exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction or control over it, either directly or through others. A person can possess an object without owning the object, provided that the person has the power and intention to control the object.

R.55, Instruction 17. The district court further instructed the jury that "knowingly" meant "that the defendant real-

ized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident." R.55, Instruction 18.

Before the district court, Mr. Hendricks objected to the possession instruction on the ground that "by indicating that momentary possession of an object is sufficient . . . it does not focus adequately upon the other component . . . , that [the] object be held knowing that [the] object was a firearm, as it applies to this case." Trial Tr. Vol. II at 148. On appeal, Mr. Hendricks makes a similar argument, but he couches it in different terms; he argues that, although he held the firearm momentarily, he did so only for an "academic" period of time, which is insufficient to establish guilt under § 922(g)(1). Appellant's Br. at 20.

Mr. Hendricks relies primarily on *United States v. Conley*, 291 F.3d 464 (7th Cir. 2002) to support his argument. In *Conley*, we stated in dicta that "[o]ur case law makes clear that an individual convicted of a felony violates § 922(g)(1) whenever he is in possession and physical control of a weapon for more than an 'academic' period of time, even if he lacks the specific intent to use the weapon for criminal purposes." *Id.* at 473 (quoting *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001)). Mr. Hendricks' reliance on this statement is misplaced. Although we gave no precise definition to the term "academic" in *Conley*, a fair reading of the reference in the context of the court's discussion leaves no doubt that the court was of the view that even a very brief possession of a firearm is sufficient to convict under § 922(g)(1). Furthermore, the court used the term "academic" based on a passage from *United States v. Lane*, 267 F.3d 715 (7th Cir. 2001), which undermines, rather than supports, Mr. Hendricks' position.

In *Lane*, this court stated: "Because a defendant can shoot a gun so quickly and easily once he holds it in his hands, we conclude that evidence showing that a felon held a gun is by itself 'a factor indicating that the defendant had the ability to exercise direct control over the [firearm].'" *Id.* at 718 (alteration in original). The court then stated that "[t]he distinction between holding a gun and obtaining control over a gun as required to prove possession is academic." *Id.* Fairly read, this passage suggests that, when a felon holds a firearm, he is in possession of the firearm, and any distinction between the two would be purely academic, in the sense of theoretical (existing only in concept and not in reality).

The possession instruction clearly informed the jury that it was required to find that Mr. Hendricks knowingly and intentionally possessed the firearm in order to convict. Because the instruction fairly and accurately summarized the law, we must conclude that the district court did not abuse its discretion when it instructed the jury that momentary possession of the firearm was sufficient to convict.

Mr. Hendricks also challenges the district court's refusal to give either of the instructions that he tendered on his theory of defense. A criminal defendant is entitled to a jury instruction on his particular theory of defense provided that four circumstances exist: "(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the [defendant] a fair trial." *Swanquist*, 161 F.3d at 1075 (internal quotations omitted); *see also Irorere*, 228 F.3d at 825.

Mr. Hendricks' first proposed instruction stated:

> On the other hand, mere presence in the vicinity of a firearm, or mere knowledge of its physical location, does not constitute possession under the statute. It is even possible for a defendant to touch a firearm, and not have possession of it.

R.50, Supp. Instruction 1. The district court refused to give this instruction on two grounds. First, the district court indicated that the instruction was not supported by the relevant case law in this circuit. *See* Trial Tr. Vol. II at 156. Second, the district court stated that the court's possession instruction, coupled with the definition of "knowing," adequately conveyed Mr. Hendricks' theory of defense to the jury. The district court also stated that Mr. Hendricks was "at liberty to argue this theory in front of the jury." *Id.*

We believe that the district court correctly analyzed the situation. Moreover, with respect to the last sentence of Mr. Hendricks' proposed instruction, the district court certainly did not err in refusing to give Mr. Hendricks' instruction on mere touching of the weapon. Mr. Hendricks correctly notes that, in *United States v. Wilson*, 922 F.2d 1336, 1338-39 (7th Cir. 1991), we suggested, albeit in dicta, that the mere touching of a firearm, bereft of any knowledge that one was actually touching a firearm, would not support a conviction. Such a theory is simply not raised by the evidence in the case before us. Although a defendant's theory of defense need only have "some foundation in the evidence, however tenuous," *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999), there is no evidence in this record to support Mr. Hendricks' proposed instruction. By Mr. Hendricks' own admission, he did not "merely touch" inadvertently the firearm; he testified that he held it in his hands and kept it well within his reach.

Finally, we agree with the district court that Mr. Hendricks' theory was reflected adequately in the court's instruction. In *United States v. Rice*, 995 F.2d 719, 725 (7th Cir. 1993), we affirmed the district court's decision to refuse an identical theory of defense instruction. We "rejected the contention that possession instructions must include a qualifier that 'mere proximity' is not possession" and determined that the district court's instruction coupled with the defendant's ability to argue his theory to the jury adequately presented his theory of defense. *Id.* As in *Rice*, the district court properly determined that its possession instruction, which clearly required Mr. Hendricks to knowingly and intentionally possess the firearm in order to convict, coupled with Mr. Hendricks' ability to argue his theory in front of the jury, fully presented his defense theory.

Mr. Hendricks also requested that the district court give an "innocent possession" instruction, which provided:

> If you find from the evidence that Mr. Hendricks discovered the firearm in question, under his passenger seat, in a stolen car and held the firearm to attempt to discover[] the identity of the object and upon realizing it was a firearm abandoned it, you may return a verdict of not guilty.

R.50, Supp. Instruction 2. The district court refused to give this instruction on the ground that it was not supported by the evidence. *See* Trial Tr. Vol. II at 157.

We find no error in the district court's refusal to give this instruction for two reasons. First, we previously have limited an "innocent possession" defense to a § 922(g)(1) charge to situations in which the elements of a justification defense (*i.e.*, necessity, duress or self-defense) are present. *See United States v. Perez*, 86 F.3d 735 (7th Cir. 1996);

*United States v. Toney*, 27 F.3d 1245 (7th Cir. 1994); *United States v. Elder*, 16 F.3d 733 (7th Cir. 1994). A justification defense clearly is not at issue in this case "because there was no evidence of an imminent threat of death or bodily injury to [Mr. Hendricks] or others." *United States v. Mason*, 233 F.3d 619, 623 (D.C. Cir. 2000), (amended Jan. 10, 2001). Mr. Hendricks does not contend otherwise.

Second, even if we were to adopt a distinct "innocent possession" defense (apart from any justification defense), the evidence in this case would not justify the giving of such an instruction. In *Mason*, the District of Columbia Circuit recognized a narrow defense for "innocent possession" under § 922(g)(1). *Id.* at 624. However, the court stated that, in order for this defense to be triggered, two requirements must be satisfied:

> The record must reveal that (1) the firearm was attained innocently and held with no illicit purpose and (2) possession of the firearm was transitory—*i.e.*, in light of the circumstances presented, there is a good basis to find that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible. In particular, a defendant's actions must demonstrate both that he had the intent to turn the weapon over to the police and that he was pursuing such an intent with immediacy and through a reasonable course of conduct.

*Id.* (internal quotations omitted). In this case, the evidence was sufficient to create a triable issue of fact on the first requirement. Both Mr. Hendricks and Barnes testified that Mr. Hendricks was unaware of the handgun until they were in Lowell and he reached under the passenger

seat.[3] However, Mr. Hendricks was not entitled to the instruction because there was no evidence to support the second requirement. Nothing in the record indicates that Mr. Hendricks "had the intent to turn the weapon over to the police," let alone "that he was pursuing such an intent with immediacy and through a reasonable course of conduct." *Id.* Mr. Hendricks did not testify that he planned to turn the gun over to the police. Moreover, the evidence shows that Mr. Hendricks had ample opportunity to turn the weapon over to the police but that he failed to do so. First, the police station was located on the same block as the Oil Exchange and Mobile station. Second, there was a pay phone outside of the Mobile station. Mr. Hendricks testified that he used this pay phone to call his aunt to see if she could pick him up; however, Mr. Hendricks did not attempt to call the police. Finally, when Officer Swisher pulled in behind the parked car at the Mobile station, Mr. Hendricks immediately should have notified the officer of the gun's whereabouts. But he did not do so. In fact, Mr. Hendricks did not tell Officer Swisher about the gun even after the officer found the loaded magazine in his pocket and specifically asked him where the gun was located. Without any evidentiary support that Mr. Hendricks took appropriate action to turn the weapon over to the police, the district court properly refused Mr. Hendricks' request to give the "innocent possession" instruction.

---

[3] The jury, of course, was entitled to disbelieve this testimony. ATF Special Agent Coulson testified that, on the morning of May 10, Barnes told him that Mr. Hendricks knew the gun was in the car while they were still in Gary.

## C. Sentencing Issues

Because Mr. Hendricks previously had been convicted of three unrelated violent felonies, the district court sentenced him pursuant to 18 U.S.C. § 924(e), the Armed Career Criminal Act, to a term of 188 months in prison.[4] Mr. Hendricks argues that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires a jury, not the district court, to determine whether the maximum statutory penalty for 18 U.S.C. § 922(g)(1) should be increased from 10 years to life imprisonment pursuant to 18 U.S.C. § 924(e) based on his criminal history.[5]

Mr. Hendricks' argument is foreclosed by this court's holdings in *United States v. Morris*, 293 F.3d 1010 (7th Cir. 2002), *United States v. Thomas*, 280 F.3d 1149 (7th Cir. 2002), and *United States v. Skidmore*, 254 F.3d 635 (7th Cir. 2001). In those cases, this court considered whether prior

---

[4] The Armed Career Criminal Act provides in relevant part that a person who is found to have violated § 922(g) "and has three previous convictions by any court referred to in section 922(g)(1) . . . for a violent felony . . . committed on occasions different from one another . . . shall be . . . imprisoned not less than fifteen years." 18 U.S.C. § 924(e)(1).

[5] The Supreme Court has held that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), does not apply where the mandatory minimum penalty for a crime is increased but the statutory maximum is not exceeded. *See Harris v. United States*, 122 S. Ct. 2406, 2414 & 2421 (2002) (Kennedy, J., plurality and Breyer, J., concurring respectively). However, that is not the situation we are confronted with in this case. Had Mr. Hendricks not qualified as an armed career criminal, the maximum sentence he could have received for a violation of § 922(g)(1) is ten years, but, because he qualified as an armed career criminal, the district court was required to sentence Mr. Hendricks to a minimum of fifteen years in prison for violating § 922(g)(1).

offenses used to enhance the applicable penalty constituted an element of the offense. We determined that, under the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), recidivism to enhance a sentence is a traditional sentencing factor and therefore determined by the court and not by the jury.[6]

Finally, Mr. Hendricks submits that the district court erred by denying him a 3 level reduction in his offense level for acceptance of responsibility.[7] The Government

---

[6] Because *Apprendi* does not require that Mr. Hendricks' sentence be reversed, we need not and do not reach the merits of his objections to the obstruction of justice or the altered/obliterated serial number enhancement. These enhancements do not affect his sentence. Under U.S.S.G. § 2K2.1, Mr. Hendricks' base offense level would have been 20; with a 2 level enhancement for both obstruction of justice and an altered/obliterated serial number, his total offense level would have been 24. However, the district court properly sentenced Mr. Hendricks as an armed career criminal pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. Section 4B1.4 provides that an armed career criminal's offense level is at least 33, absent a reduction for acceptance of responsibility. *See* U.S.S.G. § 4B1.4(b). Pursuant to this section, the district court determined Mr. Hendricks' offense level to be 33. Consequently, the enhancements did not affect his sentence in any way. Because any error relating to the obstruction of justice and altered/obliterated serial number enhancements would be harmless, we decline to reach the merits of Mr. Hendricks' objections to those enhancements. *See United States v. Smith*, 223 F.3d 554, 578-79 (7th Cir. 2000) (holding that any error in assessing defendant's criminal history was harmless, as defendant's base offense level would carry sentence of life in prison regardless of defendant's criminal history).

[7] Unlike the enhancements for obstruction of justice and altered/obliterated serial number, it is necessary to reach the mer-

(continued...)

maintains that the district court properly denied Mr. Hendricks the reduction because he denied an essential factual element of guilt and gave materially false testimony. We agree with the Government. A district court's determination that a defendant is not entitled to a sentence reduction for acceptance of responsibility is a factual one that we review for clear error. *See United States v. Cunningham*, 103 F.3d 596, 597-98 (7th Cir. 1996). The defendant bears the burden to "clearly demonstrate acceptance of responsibility by a preponderance of the evidence." *Id.* at 598.

> While a challenge to the legal basis for a charge (such as a constitutional challenge to a statute or a challenge to the applicability of a statute to the defendant's conduct) does not preclude the possibility of an acceptance of responsibility reduction, the Guidelines explain that the § 3E1.1 'adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.'

*United States v. Hamzat*, 217 F.3d 494, 500 (7th Cir. 2000) (quoting U.S.S.G. § 3E1.1 Application Note 2); *see also Cunningham*, 103 F.3d at 598 (stating that a reduction for acceptance of responsibility generally is not available for defendants who go to trial to contest "the essential

---

[7] (...continued)
its of this argument. Under § 4B1.4(b), 33 is the minimum offense level for an armed career criminal *unless* a reduction for acceptance of responsibility applies. *See* U.S.S.G. § 4B1.4(b)(3) ("If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.").

factual elements of guilt" (quoting U.S.S.G. § 3E1.1 Application Note 2)).

Mr. Hendricks contends that he should have received a reduction for acceptance of responsibility because at trial he admitted possessing the gun even though he denied that he had the requisite *mens rea* to sustain a conviction. Mr. Hendricks is correct that a legal challenge to the applicability of a statute to a defendant's actions does not necessarily exempt the defendant from an acceptance of responsibility reduction. However, the facts of this case do not support such a characterization. An essential factual element of guilt under § 922(g)(1) is that the defendant "knowingly possessed the firearm . . . described in the indictment." *United States v. Bradley*, 145 F.3d 889, 893 (7th Cir. 1998). By denying that he knowingly possessed the gun, Mr. Hendricks challenged an essential factual element of the charged offense. For this reason, the district court did not err by refusing to grant him a reduction for acceptance of responsibility. *See United States v. Williams*, 202 F.3d 959, 962 (7th Cir. 2000) ("If a defendant challenges factual evidence of guilt as well as legal principles, however, he typically will be ineligible to receive the acceptance of responsibility reduction.").

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
