**STATE of Delaware**

v.

**Vernon HEATH.**

**ID No. 0604007616.**

Superior Court of Delaware,
Kent County.

Submitted: Aug. 18, 2006.

Decided: Nov. 28, 2006.

---

Alexis Schuette, Deputy Attorney General, Wilmington, DE, for the State of Delaware.

James Nutter, Eric Mooney, P.A., Georgetown, DE, for Defendant.

## OPINION

YOUNG, J.

On June 29, 2006, the Court heard testimony regarding the Defendant's Motion to Suppress. Thereafter, the Court received the State's Response to Defendant's Motion and the Defendant's Reply in Support

of the Motion. Based on the testimony and the arguments presented, and for the following reasons, the Defendant's motion is GRANTED.

## STATEMENT OF FACTS

At approximately 8:45 p.m. on April 10, 2006, Officer Keith Shyers of the Harrington Police Department arrived at a home on New Street, Harrington, Delaware to serve warrants in a drug investigation. After failing to make contact with the individuals, Officer Shyers returned to his patrol car,[1] intent on obtaining a search warrant for the residence. As Officer Shyres backed out of the driveway of the home and into the intersection of New and Thorpe Streets, the Defendant, Vernon Heath, brought his vehicle, a black Chrysler 300, to a stop before the driveway to allow the officer's car onto the roadway. Upon making eye contact with the Defendant, Officer Shyres rolled down his window, and inquired whether the Defendant was turning onto New Street, which Officer Shyers testified he knew to be a high drug area of Harrington. The Defendant responded that he was headed "around the corner" toward Clark Street.[2] The conversation then ended. Defendant continued on Thorpe Street making a left-hand turn onto East Street, which intersects with Clark Street.

Upon seeing the tags to the Defendant's vehicle, Officer Shyres ran the registration on his in-car computer, and noted that the vehicle came back to a Bridgeville or Greenwood address. He testified that this information aroused his suspicions, because these two towns are south of Harrington, whereas the Defendant's intended course took him north. The officer doubled back to follow the Defendant, encountering him before the Defendant made the left-hand turn from East Street onto Clark Street. The officer continued his pursuit as the Defendant made the turn onto Clark Street, passing both Ward Street and Delaware Avenue. As the Defendant crossed the Conrail railroad tracks that intersect Clark Street, he activated his left turn signal, turning south onto Hanley Street. Officer Shyers then activated his emergency equipment. In response, the Defendant pulled his vehicle over to the side of Hanley Street.[3]

In the affidavit of probable cause, Officer Shyres stated the reason for the stop was the Defendant's violation of 21 *Del. C.* § 4155(b), which states that "[a] signal of intention to turn or move right or left when required shall be given continuously during not less than the last 300 feet or more than one-half mile traveled by the vehicle before turning." According to Officer Shyres, the Defendant signaled for approximately 20 to 30 feet prior to turning left onto Hanley Street. Officer Shyres proceeded to make a traffic violation stop, though he admitted on cross-examination at the suppression hearing that his additional purpose in stopping the vehicle was to investigate whether the Defendant or his passenger were connected with the warrants the officer had attempted to serve on New Street.

1. Officer Shyres testified at the suppression hearing that he could not recall whether the car was a marked or unmarked Harrington Police Department vehicle.

2. Clark Street is also known as Route 14, a major east-west connector between Milford and the Delaware–Maryland state line. Before the Harrington town limits the road is additionally known as the Milford–Harrington Highway.

3. Hanley Street runs roughly south-westerly and dead ends into Reese Street. Reese Street connects to both Route 14 and Farmington Road, which runs southward to Farmington.

Officer Shyres approached the vehicle, and requested the Defendant's license, registration, and insurance. During this initial contact with the Defendant, the officer noticed the Defendant's eyes were bloodshot. The officer stated, however, that the Defendant did not appear nervous or confused or under any substance influence. Additionally, Officer Shyres observed many air fresheners hanging from the handles in the ceiling of the backseat of the Defendant's vehicle. Based on training Officer Shyres received in drug interdiction courses, he testified that several air fresheners can be used as a masking agent to hide the bouquet of certain controlled substances. The testimony did not make mention of the actual number of air fresheners in the backseat, or whether any were hanging from the rear-view mirror. When Officer Shyres spoke to the Defendant, he did not notice any odor emanating from the air fresheners, nor did he notice an odor of alcohol, marijuana or other controlled substance associated with the Defendant or coming from the car.

At this point, at the Officer's request, the Defendant produced his license. Officer Shyres returned to his vehicle to run the Defendant's license through the computer system. The license was valid, and the Defendant had no active warrants. Although the Defendant was later charged with Failure to Have Registration Card in Possession and Failure to Have Insurance Identification in Possession, the officer testified he was unsure if the Defendant provided either the registration or proof of insurance. Despite the confusion on this issue, the officer knew, from having previously run the tag number, that the vehicle was properly registered to a person in Bridgeville or Greenwood, who the officer would later discover was the Defendant's sister. In addition, while the Defendant's passenger, who of course was not driving, was unable to produce a driver's license,

he did provide Officer Shyres with his name, permitting the officer to confirm the passenger's identity, and to determine the absence of any warrants for his arrest. During this time, Office Longski arrived on the scene to assist Officer Shyres with the traffic stop.

Instead of issuing the Defendant a citation for the traffic offenses for which he was stopped, allowing him to continue on his way, Officer Shryres asked the Defendant out of the car to conduct what he termed a "road side investigation." At the suppression hearing, Officer Shyres was asked if this continued investigation had anything to do with the Defendant's alleged failure to signal. He responded that it did not.

Later in his testimony he stated that he would not have stopped the Defendant had a traffic violation not been committed.

After asking the Defendant to step out of the vehicle the officer conducted a pat down search. That, he stated, was his usual practice. At the suppression hearing, Officer Shyres testified that his statement at the preliminary hearing that he never had any indication that either the Defendant or his passenger was armed was true. Once the pat down was completed, Officer Shyres then began questioning the Defendant as to his business abroad and destination. The Defendant replied that he was returning home to Greenwood (which is south of the detention site) after an evening at the Midway Slots where he had won $300 to $400. Officer Shyres believed this story to be implausible because the Defendant was "traveling north" and Hanley Street was not the most direct route out of town. The Defendant responded that he always drove through Harrington in order to get home. In addition, the Defendant stated that he had just dropped off a friend nearby, al-

though he could not provide a name or the location. Officer Shyres stated that he was suspicious of even the Defendant's story regarding his visit to Midway Slots, because the *passenger* was 19 years old, and one must be 21 in order to enter the slot parlors. The exchange ended. Officer Shyres had the Defendant stand between his police vehicle and Officer Longski's vehicle.

Next, Officer Shyres asked the passenger to step out of the vehicle. He then immediately conducted a pat down search. During the search, the officer felt a large soft item in his top right pocket. The passenger stated it was cigarettes, but the officer did not believe it felt like cigarettes. Officer Shyres reached in the passenger's pocket, and retrieved 29 sandwich bags containing a green leafy substance which later testing revealed to be marijuana. The passenger was immediately arrested and placed in the backseat of Officer Shyres's patrol car.

At this point, Officer Shyres asked the Defendant for his consent to search the vehicle. Consent was granted. Officer Longski conducted the search, discovering a small white chunky substance on the rear floor behind the driver's seat, which field-tested positive as cocaine. The Defendant was placed in Officer Longski's patrol car. Both the Defendant and passenger were transported to the Harrington Police Department. Upon arriving at the station, the Defendant was placed in an interrogation room. The two officers watched on closed circuit television as the Defendant placed an unidentifiable item into the garbage can. The Defendant then placed a gum wrapper in the can, pushed both items to the bottom, and urinated in the can. The officers then placed the Defendant in a holding cell, and searched the garbage can. The search revealed what later field-tested positive as 18 grams of cocaine. Officer Shyres stated that the interrogation room is cleaned on Sundays and Wednesdays. This occurred on a Monday night. According to the testimony, no one else had been in the room before the Defendant.

As a result of the foregoing, the Defendant was charged with multiple drug related offenses.

## DISCUSSION

Defendant moves to suppress all evidence obtained by the State as a result of Officer Shyres's traffic stop and subsequent search of his vehicle. The Defendant asserts two bases to support his motion. First, he takes the position that the initial traffic stop was effected for the purpose of conducting an otherwise illegal search, in which event Article I, Section 6 of the Delaware Constitution prohibits police officers from making such a "pretextual stop." Second, he claims that, even if the initial stop were held valid, the subsequent detention and search exceeded the permissible bounds of a traffic stop under the Fourth Amendment of the United States Constitution. Further, Defendant asserts that his consent did not serve as a cure, because it was a product of the original unlawful seizure.

The State, in answer to the Defendant's first argument, contends that the initial stop was not purely pretextual, but that even if it were the U.S. Supreme Court's decision in *Whren v. U.S.*[4] validates that search. Thus, the State argues, the initial stop and search were legal. Additionally, the State argues that Officer Shyres in fact possessed reasonable suspicion of criminal activity. Hence, the State

---

**4.** 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

says, the subsequent investigation and search were constitutionally valid.

## I. The Standard of Review in a Motion to Suppress.

■ When presented with a motion to suppress, the Delaware Courts have consistently stated that the Defendant bears the burden of establishing that the challenged search or seizure violated his rights under the United States Constitution, the Delaware Constitution, or the Delaware Code.[5] The Defendant must demonstrate that he is entitled to the relief requested by a preponderance of the evidence.[6]

## II. The Initial Traffic Stop.

The Defendant first argues that the initial traffic stop effectuated by Officer Shyres violates Article I, Section 6 of the Delaware Constitution of 1897, on the theory that our constitution prohibits searches based on purely pretextual traffic stops. The State responds that our constitution, like the federal constitution, finds nothing inherently suspect with such a process. Furthermore, the State urges this Court to adopt the U.S. Supreme Court's rationale in *Whren* when considering Article I, Section 6 to assess the legality of these stops under our constitution.

### A. Purely Pretextual Stop.

Before beginning to ascertain the constitutionality of a purely pretextual traffic stop under Article I, Section 6, it may be important to understand exactly what such a stop is, and why so many courts and commentators consider them so suspect. One commentator has defined a "pretextual stop" as "a traffic stop that occurs when an officer has probable cause or reasonable suspicion to believe that a motorist has violated a traffic law, but which the officer would not have made absent a desire, not supported by probable cause or reasonable suspicion, to investigate a more serious offense."[7] For example, such a stop can arise when an officer observes a vehicle driving 26 miles per hour in a 25 m.p.h. zone, has some subjective reason to suspect that the vehicle is involved in the drug trade, and uses this minor violation of the traffic laws to investigate his hunch further. Despite the fact that a traffic stop certainly is less intrusive than the search of a home, such a stop is not a mere inconvenience. The U.S. Supreme Court and the Courts of our state have repeatedly stated that a traffic stop constitutes a seizure of a vehicle and its occupants under the (U.S.) Fourth Amendment, and presumably under (Delaware's) Article I, Section 6.[8] The U.S. Supreme Court has held that such seizure is valid when supported by reasonable articulable suspicion, as defined in *Terry v. Ohio*, and is supported by probable cause.[9] While the *Whren* decision is asserted to hold that the officer's possession of probable cause for the stop is sufficient to end the Fourth

---

**5.** *State v. Dollard*, 788 A.2d 1283, 1286 (Del.Super.2001) (citing *State v. Huntley*, 777 A.2d 249 (Del.Super.2000)).

**6.** *Id.* (citing *State v. Bien–Aime and Smalls*, 1993 WL 138719, at *3 (Del.Super.1993)).

**7.** *Brian J. O'Donnell, Note, Whren v. United States: An Abrupt End to the Debate Over Pretextual Stops*, 49 Me. L.Rev. 207, 208, n. 3 (1997).

**8.** See *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Caldwell v. State*, 780 A.2d 1037, 1045–1046 (Del.2001).

**9.** See *Brignoni–Ponce*, 422 U.S. at 880–881, 95 S.Ct. 2574 and *Whren v. United States*, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); See also *Caldwell*, 780 A.2d at 1045–1046 and 11 *Del. C.* § 1902.

Amendment inquiry, the Defendant maintains that purely pretextual stops present a unique danger that Article I, Section 6 was enacted to address, and that the mere existence of original pretextual probable cause does not end the inquiry.

The danger cited by the Defendant arises from the fact that "[t]he traffic code is sufficiently extensive in its regulation that '[w]hether it be for failing to signal while changing lanes, driving with a headlight out, or not giving full time and attention to the operation of the vehicle, virtually the entire driving population is in violation of some regulation as soon as they [sic] get into their [sic] cars, or shortly thereafter.' " [10] In fact, studies conducted on a stretch of I–95 between Baltimore and Delaware demonstrate that 93% of all drivers were observed committing some type of traffic violation. [11] The Defendant contends that this situation vests the police of our state with unlimited discretion to stop any driver for any reason in contravention of the protections embodied in Article I, Section 6. This unbridled discretion gives rise to the danger of arbitrary police action. That, the Defendant argues, is precisely demonstrated in this case by the arbitrary nature of the traffic violation he is charged with committing. While the *Whren* Court

arguably did not find the arbitrariness of these stops offensive to the Fourth Amendment, the Defendant believes Delaware's Declaration of Rights requires a different result. [12]

## B.   The Rationale of *Whren*

As the State's argument demonstrates, the consideration of the constitutionality of pretextual stops is not novel. In *Whren,* the Supreme Court attempted to settle a long dispute among the federal Circuit Courts and various state appellate courts as to the constitutionality and analysis of such pretextual traffic stops under the Fourth Amendment. [13] In the decades prior to *Whren,* some courts had adopted a test focused solely on the officer's motivation. Under this test, the court would ask if the officer's "real reason for making the stop was a desire to investigate a hunch or harass a racial minority, rather than a desire to enforce the traffic laws." [14] If it were the former, then the stop would be invalid, and any evidence subsequently discovered suppressed. [15] This inquiry into the officer's subjective motivation was frequently criticized as being too impractical to administer and in direct conflict with the U.S. Supreme Court's holding that the

---

**10.**   *State v. Ladson,* 138 Wash.2d 343, 979 P.2d 833, 842, n. 10 (1999) (quoting Peter Shakow, *Let He Who Never Has Turned Without Signaling Cast the First Stone: An Analysis of Whren v. United States,* 24 Am. J. Crim. L. 627, 633 (1997)).

**11.**   *Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115, 1120 n. 4 (Md.1997) (citing *David A. Harris, Whren v. United States: Pretextual Traffic Stops and 'Driving While Black,'* The Champion, March 1997, at 41.).

**12.**   In this case, for example, the block of the street from which Defendant turned was less than 300 feet in length. One can hypothesize a situation where someone turned right on to

that block, intending to turn left at the end of it. In order to comply with the "300 feet" signal distance for his left turn, he would have to engage the turn signal before he even turned right on to the street. As inane a scenario as that presents, it would be the only way to show a left turn signal 300 feet ahead of the point of the turn to comply with the literal requirements of the statute, which requirements are being utilized here to justify the stop.

**13.**   O'Donnell, *supra* n. 7.

**14.**   *Id.* at 211.

**15.**   *Id.*

Fourth Amendment's reasonableness standard was not a subjective test.[16]

In response, the Ninth, Tenth, and Eleventh Circuits, as well as numerous state appellate courts, adopted what is termed the "would have" test.[17] This test asks "whether under the same circumstances a reasonable police officer would have made the stop in the absence of the invalid purpose."[18] The courts believed this test cured the failings of the subjective motivation test in that it "preserve[d] the Supreme Court's requirement of an objective inquiry into Fourth Amendment activity and provide[d] meaningful judicial review of discretionary police action."[19] Therefore, this test turned not on the motivation of a particular officer in making the particular stop, but rather on whether that officer's actions deviated from standard police practice.[20] Despite the objective focus of the "would have" test, the majority of the Circuits rejected it, adopting instead the "could have" test. Under that test, "courts simply inquire whether, at the time of the stop, the police officer reasonably believed the defendant was committing a traffic offense, and whether the law authorized a stop for such an offense."[21] Thus, a reviewing court's inquiry would begin and end with a determination as to whether there was reasonable suspicion or probable cause that a traffic violation occurred.

In *Whren,* the U.S. Supreme Court was presented with a case of an allegedly pretextual traffic stop, allowing the Court to address the Circuit division that had developed. On June 10, 1993, two plainclothes Washington, D.C. police officers were patrolling a high drug area in an unmarked car when they spotted two young men in a truck with temporary plates waiting at a stop sign.[22] The officers became suspicious because the truck remained stopped for more than 20 seconds, which the officers believed to be an unusually long period of time.[23] When the officers made a U-turn to investigate further, the truck turned right without signaling, and then sped off.[24] When the officers caught up with the truck, one of them approached the vehicle to warn the driver about his traffic violations.[25] At that point the officer observed the passenger, Michael Whren, holding two baggies of what appeared to be crack cocaine.[26] The driver, James Brown, and Whren were then arrested and charged with violating various federal drug laws.[27] The two petitioners moved to suppress the drugs arguing the officer's motive for stopping them was pretextual.[28] The District Court denied the motion, and

16. *Id.*

17. *Id.* at 212.

18. *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988) (quoting *United States v. Smith,* 799 F.2d 704, 709 (11th Cir.1986)).

19. *Id.*

20. *Id.*

21. *United States v. Johnson,* 63 F.3d 242, 246 (3rd Cir.1995) ("Under [this] approach, materials seized following a traffic stop are admissible so long as a reasonable police officer could have made the stop.").

22. *Whren v. United States,* 517 U.S. 806, 808, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

23. *Id.*

24. *Id.*

25. *Id.*

26. *Id.* at 809, 116 S.Ct. 1769.

27. *Id.*

28. *Id.*

the petitioners were later convicted.[29] The Circuit Court affirmed their conviction, stating with respect to the motion to suppress, that "a traffic stop is permissible as long as a reasonable officer in the same circumstances could have stopped the car for the suspected traffic violation."[30]

In support of their appeal before the Supreme Court, the petitioners argued that the correct Fourth Amendment test for traffic stops was the "would have" test discussed above.[31] Petitioners contended that this test addressed the Court's concern with the danger presented by arbitrary police action, conformed to the Court's requirement of an objective test for Fourth Amendment reasonableness, and mirrored case law on DUI roadblocks and inventory searches by placing the officer's conformity with standard police practices at its center.[32] The Government responded that the correct test was the "could have" test adopted by the D.C. Circuit Court, which the Government argued was easier to apply, truly objective and consistent with Supreme Court precedent.[33] The Supreme Court rejected the petitioners' arguments, adopting the "could have" test. The Court disregarded petitioners' argument that precedent favored the "would have" test, distinguishing the

DUI roadblock and inventory search cases because those cases dealt with the validity of seizures and searches in the absence of probable cause.[34] Additionally, the Court dismissed the "would have" test as one aimed at reaching subjective intent through objective means in contravention of precedent holding that the "Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent."[35] In the final analysis, though the facts of *Whren* well exceed "pure pretext,"[36] for the Supreme Court, an officer's mere possession of probable cause of a traffic violation seems sufficient to satisfy Fourth Amendment requirements regardless of his underlying motivation.[37]

## C. The Rationale of Article 1, Section 6 of the Delaware Constitution

■ While the U.S. Supreme Court has stated the foregoing position on the constitutionality of pretextual traffic stops under the Fourth Amendment, no Delaware court has addressed whether our constitution sanctions or prohibits these stops and, in either event, how the Court is to ascertain the constitutionality of the stop.[38]

29. *Id.*

30. *Id.* (quoting *United States v. Whren*, 53 F.3d 371, 374–375 (D.C.Cir.1995)).

31. *Id.* at 810, 116 S.Ct. 1769.

32. O'Donnell, *supra* n. 7 at 217–218 (citing Petitioners' Brief in *Whren*).

33. *Id.* at 219 (citing Respondent's Brief in *Whren).*

34. *Whren*, 517 U.S. at 811, 116 S.Ct. 1769.

35. *Id.* at 814, 116 S.Ct. 1769 (citing *United States v. Robinson*, 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)).

36. It is interesting to note that the circumstances in *Whren* may not have demanded the analysis provided, since other factors existed arguably justifying the police stop: the undue waiting of the vehicle at the stop sign; the speeding off; the temporary plates; to say nothing of the open observation of baggies upon mere approach to the vehicle.

37. *Id.* at 819, 116 S.Ct. 1769.

38. When the Delaware Supreme Court was presented with this issue in *Caldwell v. State*, 780 A.2d 1037 (Del.2001), it instead rested its decision on the Fourth Amendment violation. For the reasons stated in this opinion, the Court feels it must address the issue today.

The Defendant's state constitutional argument can be case determinative.[39] If Article I, Section 6 of the Delaware Constitution prohibits purely pretextual stops to satisfy searches, and if the initial traffic stop in this case is purely pretextual, then the stop (for subsequent purposes) is unconstitutional *ab initio,* and all evidence ultimately acquired against the Defendant must be suppressed as fruit of the poisonous tree. This is a question independent of any Fourth Amendment inquiry.

"The Declaration of Rights in the Delaware Constitution is not a mirror image of the federal Bill of Rights. Consequently, Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in 'lock step' with the United States Supreme Court's construction of the federal Bill of Rights."[40]

Or, as the Court earlier held in *Sanders v. State:*

"If [this Court were] to hold that our Constitution is simply a mirror image of the Federal Constitution, [it] would be relinquishing an important incident of this State's sovereignty. In a very real sense, Delaware would become less of a State than its sister States who recognize the independent significance of their Constitutions."[41]

Indeed numerous States have, of late, taken the advice of Justice Brennan and Justice Stevens to interpret their constitutions independently of the Federal constitution.[42] Consistent with that pronouncement, the *Sanders* Court concluded that, "this State's judicial branch should not be foreclosed from interpreting our Constitution merely because the United States Supreme Court has interpreted similar provisions of the Federal Constitution."[43]

An exegesis into the development of Delaware's constitution,[44] leads to the historic, express rejection of the use of "general warrants". Thus, Delaware's 1776 Declaration of Rights has bearing on the Court's opinion because it contains Delaware's early search and seizure protection for its citizens.[45] These protections were codified in Section 17 of that document, which stated:

"That all warrants without oath to search suspected places or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or any

---

**39.** *See Massachusetts v. Upton,* 466 U.S. 727, 735–738, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (Stevens, J., concurring) (Stevens noted that the Supreme Judicial Court of Massachusetts did a disservice to judicial economy and to the rights of the people of Massachusetts by not first addressing whether the warrant was valid under Article 14 of the Massachusetts Declaration of Rights.)

**40.** *Dorsey v. State,* 761 A.2d 807, 814 (Del. 2000).

**41.** *Sanders,* 585 A.2d 117, 145 (Del.1990).

**42.** *See Michigan v. Mosley,* 423 U.S. 96, 111–121, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)

(Brennan, J., dissenting) and *Upton,* 466 U.S. at 735–738, 104 S.Ct. 2085 (Stevens, J., concurring).

**43.** *Sanders,* 585 A.2d at 145.

**44.** Holland, Randy J., The Delaware State Constitution: A Reference Guide 36 (Greenwood Press 2002) ("Delaware's 1776 Declaration of Rights was based on a similar provision in the Pennsylvania Declaration of Rights.") *See also* 1 Bernard Schwartz, The Bill of Rights: A Documentary History 276 (1971).

**45.** *Dorsey v. State,* 761 A.2d 807, 816 (Del. 2000).

person in special, are illegal and ought not to be granted." [46]

■ This was later refined at the Constitutional Convention of 1791. Upon ratification, the new search and seizure protections of the Delaware Constitution would be found in Article I, Section 6. The new section provided:

"The people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation." [47]

The question then becomes whether that provision sanctions or prohibits the "merely" or "purely" pretextual traffic stop. Allowing the police unfettered discretion to use a Title 21 traffic violation to search for evidence to support an officer's hunch about a Title 11 or Title 16 offense becomes, in circumstances confronting the Court in this case, the equivalent of granting the police a general warrant to search and seize virtually all travelers on the roads of this State. Is, then, the mere possessing of probable cause to stop a vehicle for a traffic violation not sufficient to secure the constitutionality of the stop for unrelated searches? While the expectancy of privacy has been determined to be decidedly diminished as to automobiles as compared to homes, some fundamental rights do exist. Article I, Section 6, in the context of the purely pretextual traffic search, is significant by its prevention of the general warrant. Based on the language, previous interpretation, and unique history of Article I, Section 6, purely pretextual stops run afoul of the underlying purpose of that provision. To be clear, the Court certainly is not holding that all stops based on probable cause of a violation of a Title 21 traffic offense are somehow unconstitutional. [48] Rather, the concern is with those traffic stops demonstrated to have been made· exclusively for the purpose of investigating an officer's hunch about some other offense.

## D. The Test Analysis for Pretextual Stops

■ Various commentators have written on this topic, [49] providing framework for consideration of the appropriate analysis. So, we look to the designation of an appropriate process. The first step is to ask if, at the time of the stop, the police officer reasonably believed the defendant was committing a traffic offense, and whether the law authorizes a stop for such an offense. [50] In other words, was there proba-

46. Declaration of Rights and Fundamental Rules of the Delaware State § 17 (1776).

47. Del. Const. art. I, § 6 (1792). The Court notes that although Delaware has called two additional Constitutional Conventions since 1792, the language of Article I, Section 6 has remained unchanged since its drafting 214 years ago.

48. For example, in a recent decision of this Court, a stop for a failure properly to signal a turn was held to be sufficient to support a search for drugs when location in a known drug dealing area, presence of a likely purchaser beside the vehicle, rapid departure upon police arrival, etc., also existed, giving foundation for the experienced drug enforcement officer's strong suspicion of a drug dealing activity.

49. See, for example, Peter Shakow, Note, *Let He Who Never Turned Without Signaling Cast the First Stone: An Analysis of Whren v. United States*, 24 Am. J. Crim. L. 627 (1997) and Patricia Leary & Stephanie Rae Williams, *Toward a State Constitutional Check on Police Discretion to Patrol the Fourth Amendment's Outer Frontier: A Subjective Test for Pretextual Seizures*, 69 Temp. L.Rev. 1007 (1996).

50. See Leary, *supra* n. 81 at 1037. This is essentially the "could have" test currently ap-

ble cause or reasonable suspicion of a traffic violation such that a reasonable officer could have effectuated the stop? This step initially places the burden on the State to demonstrate that. If the Court finds no probable cause or reasonable suspicion existed, then the analysis ends, because the seizure was simply unreasonable regardless of the underlying motivation. If the Court does find probable cause or reasonable suspicion, then the analysis continues to the second step.

■  That second step is the burden of the defendant. Here the inquiry is whether an unrelated purpose motivated the stop, and whether (absent the unrelated or "hunch" purpose) a reasonable police officer would have made the stop.[51] The defendant meets this burden by showing that: (1) he was stopped only for a traffic violation; (2) he was later arrested for and charged with a crime unrelated to the stop; (3) the crime or evidence of the crime was discovered as a result of the stop; (4) the traffic stop was merely a pretextual purpose, alleging that the officer had a hunch about, or suspected the defendant of, a non-traffic related offense *unsupported* by reasonable suspicion; and (5) the pretext can be inferred, at least, when the suppression hearing evidence is presented.[52] The salient question presented is whether defendant could meet his burden through *inter alia:* (1) evidence of the arresting officer's non-compliance with written police regulations; (2) evidence of the abnormal nature of the traffic stop; (3) testimony of the arresting officer that his reason for the stop was pretextual; (4)

evidence that the officer's typical employment duties do not include traffic stops; (5) evidence that the officer was driving an unmarked car or was not in uniform; and (6) evidence that the stop was unnecessary for the protection of traffic safety.[53] The above six factors are not exhaustive, but merely suggested ways for the court to get a view of the totality of the circumstances surrounding the stop.[54] If the defendant fails to meet his burden, then the initial traffic stop is not shown to be purely pretextual, in which event it would be constitutional. However, if the defendant meets his burden, pretextualism is presumed. In that event the State would have an opportunity to offer evidence in rebuttal, the final step of this test.

■  That rebuttal would be accomplished by demonstrating that a non-pretextual rationale existed for the stop.[55] As previously indicated, to prevail in step one, the State merely has to present a written traffic regulation and show the officer had probable cause or reasonable suspicion for the stop. In this final step, though, the State must show more than just the existence of some traffic violation. The required totality can be met by the State's showing: (1) that reasonable suspicion existed for the underlying criminal offense; (2) that this traffic stop was completely routine; (3) that this traffic stop was made under the perception that it was necessary to protect traffic safety; (4) that the officer's subjective intent in making the stop was legitimate.[56] As in the second step, this is not an exhaustive checklist.

plied by U.S. Supreme Court when presented with pretextual stops.

**51.** See Shakow, *supra* n. 81 at 640. This is essentially the "would have" test.

**52.** *Id.* at 639–640.

**53.** *Id.* at 640.

**54.** *Id.*

**55.** *Id.* at 641.

**56.** *Id.* at 641–642.

Certainly, the enforcement of Delaware's criminal code including the safety of our roads *vis a vis* the protection of our liberties requires the striking of a proper balance. While the shifting burden analysis ensures that only the most blatant pretextualism falls within its penumbra, it does discourage the purely pretextual stop.

### E. Suppression in the Present Case

■ Applying the first prong of the above analysis to the present case, the evidence is sufficient that Officer Shyres possessed the probable cause necessary to effectuate the traffic stop. At the suppression hearing, and in its reply to the Defendant's written motion, the State placed before the Court both the traffic regulation at issue, 21 Del. C. § 4155(b) (which requires that a motorist signal at least 300 feet before turning), and testimony by Officer Shyres that he observed the Defendant signal for only approximately 20 to 30 feet prior to turning left onto Hanley Street. The State's burden is met for step one.

Proceeding, then, to step two, and shifting the burden to the Defendant, the question is whether an another purpose, unrelated to a traffic offense, motivated the stop; and whether, absent that ulterior purpose, a reasonable officer would have made the stop.

The Defendant stated in his May 8, 2006, motion to suppress that the Defendant was stopped for the traffic violation of failing to signal a turn properly; that he was subsequently arrested for and charged with a crime unrelated to that traffic offense; and that evidence of the crime charged was discovered as a result of the stop. In addition, the Defendant averred that the traffic stop initiated by Officer Shyres was pretextual. The Defendant supports his position by citing Officer Shyres's testimony at the preliminary hearing, and later the suppression hearing, which demonstrated that he lacked reasonable suspicion of non-traffic criminal activity. To that effect, the officer stated that, after his initial encounter with the Defendant, he became suspicious, because the Defendant was passing near New Street, known by the officer to be a "high drug area," and because the Defendant's vehicle was registered to a Bridgeville or Greenwood address.

■ Accordingly, the Court begins by ascertaining whether the officer possessed the "reasonable suspicion" necessary to support his hunch of non-traffic criminal activity. Reasonable suspicion has been defined as "the officer's ability to 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.'"[57] For a court to determine if there is reasonable suspicion, it must look at the totality of the circumstances.[58] The Delaware Supreme Court has labeled the police claim of a "high drug area" a "familiar mantra,"[59] and has held that reasonable suspicion "cannot be based on a defendant's presence in a particular neighborhood at a particular time of day with no independent evidence that the defendant has committed, is committing or is about to commit a crime."[60]

Here, there is no independent evidence of a crime.

**57.** *Coleman v. State*, 562 A.2d 1171, 1174 (Del.1989) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889(1968)).

**58.** *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).

**59.** *Caldwell v. State*, 780 A.2d 1037, 1043, n. 1 (Del.2001).

**60.** *Jones*, 745 A.2d at 871.

The fact Defendant may have been visiting Harrington from Greenwood or Bridgeville does not alter that condition. The Seventh Circuit has held that the mere fact a person is from out of town is not enough to support a finding of reasonable suspicion.[61] In a state the size of Delaware, nothing inherently suspicious can be concluded about a resident of Greenwood or Bridgeville, two towns and but a few miles south of Harrington, who is driving through Harrington.

■ As to the merely pretexual nature of the stop. Officer Shyres did not contend that he had an independent basis to believe criminal activity was afoot. He candidly admitted, for example, that he did not have any previous encounters with the Defendant or have an informant who tipped him off about the Defendant's current criminal activity. Instead, Officer Shyres essentially possessed only a mere hunch about the Defendant's criminal activity. This is supported by the officer's own suppression hearing testimony, in which he stated that one of the reasons he stopped the Defendant was to continue the "investigation" of the Defendant's reason for driving near New Street, and to ascertain whether the Defendant or his passenger had been involved in the drug investigation the officer was serving warrants in on New Street. As the Supreme Court stated in *Harris v. State*, an "inchoate and unparticularized suspicion or hunch of experienced police officers is insufficient to support a finding of reasonable suspicion as a matter of law."[62] Therefore, given the totality of the circumstances, prior to the traffic stop, Officer Shyres lacked reasonable suspicion of any non-traffic criminal activity on the part of the Defendant.

Furthermore, the Defendant supports his assertion of pretext by directing the Court's attention to the nature of the traffic violation, and to Officer Shyres's own testimony regarding the stop. In the present case, the Defendant was charged with violating 21 *Del. C.* § 4155(b) by signaling his intention to turn left onto Hanley Street 30 feet before turning instead of the required 300 feet. Officer Shyres' testimony at the suppression hearing raised doubt as to whether 300 feet even existed between Ward Street and Hanley Street for the Defendant to signal his intention to turn. Indeed, other than Officer Shyres being behind the Defendant, no evidence suggests that anyone was in the area even to see a signal. Nevertheless, the Defendant did, in fact signal prior to executing his turn. While the signal lasted for less than 300 feet, so too did Clark Street last for less than 300 feet. Hence, literal compliance with the statute's requirements was impossible.

Additionally, the officer testified that, when he stopped the Defendant he did so wanting to continue questioning the Defendant as to his reason for being in the vicinity of New Street. This is a rather clear admission of a motive to stop, which is completely removed from the *basis* of the stop. Therefore, given the totality of the circumstances surrounding the stop, this Court holds that the Defendant has properly averred and supported his argument of mere pretext for the stop. No

---

61. *United States v. Pavelski*, 789 F.2d 485, 489 (7th Cir.1986) (Law enforcement officers in Portland, Oregon lacked reasonable suspicion when they stopped a vehicle on the basis that the vehicle (1) contained four men, (2) had out-of-town license plates (from Colorado, not a "source state"), and (3) made a sharp, abrupt turn. Beyond these facts, the officer who made the investigatory stop possessed no further "objective facts indicating criminal activity.").

62. *Harris v. State*, 806 A.2d 119, 128 (Del. 2002).

reasonable suspicion of non-traffic criminal activity existed.

The State's evidence, potentially available for the "step three rebuttal," does not provide anything further to demonstrate a stop other than purely pretextual.

### F. Officer Shyres Lacked the Reasonable Suspicion Necessary to Validate the Subsequent Detention.

Delaware Courts, interpreting the Fourth Amendment, have held that a traffic stop is a seizure of a vehicle and its occupants by the State, and therefore is subject to constitutional limitations.[63] The Delaware Supreme Court has held that the duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop.[64] In cases where a traffic stop turns into an investigation on another matter the Court has stated:

> "[T]he State must demonstrate that the stop and any subsequent police investigation were reasonable in the circumstances. First, the stop must be justified at its inception by reasonable suspicion of criminal activity as defined in *Terry v. Ohio*. Second, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' "[65]

■■■■ Therefore, for an officer to conduct an investigation beyond that required in order to complete the purpose of the traffic stop, the occupants must con-

sent or the officer must have independent facts sufficient to justify this additional intrusion.[66] To possess these "independent facts" the officer must have reasonable and articulable suspicion based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion."[67] The *Caldwell* Court made clear that an officer's observation of a traffic offense "does not confer upon him the right to abandon or never begin to take action related to the traffic violation, and, instead attempt to secure a waiver of Fourth Amendment rights."[68] While *Whren* is utilized to declare that a purely pretextual stop is not offensive to the Fourth Amendment, the standard announced by the *Caldwell* Court effectively works to place a restriction on "police officers' authority to employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements."[69]

In *Caldwell*, the police observed the defendant and a passenger parked in a fire lane, which is a violation of 21 Del. C. § 7001. As the officer approached the vehicle, the defendant pulled away from the curb. The officer followed, and a short time later activated his emergency lights, pulling the defendant over. As the officer did so, he noticed the defendant doing something with his hand. As a result, the officer called for back-up. When the officer approached the vehicle he noticed that the defendant was extremely nervous, was

---

63. *Caldwell v. State*, 780 A.2d 1037, 1045–1046 (Del.2001).

64. *Id.* at 1047.

65. *Id.* at 1046 (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 880–881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

66. *Id.* (citing *Ferris v. State*, 355 Md. 356, 735 A.2d 491, 499 (1999)).

67. *State v. Miliany–Ojeda*, 2004 WL 343965, at *3 (Del.Super.2004) (citing *Jones v. State*, 745 A.2d 856, 861 (Del.1999)).

68. *Caldwell*, 780 A.2d at 1048.

69. *Id.* at 1048.

perspiring, and had hands that were shaking. The officer then asked the defendant for his license and registration, which the defendant produced. Next, because the defendant was acting in a manner considered strange, the officer ordered him out of the vehicle. When the officer inquired about the identity of the passenger, the defendant responded that he did not know his name. The officer immediately frisked and handcuffed both the defendant and his passenger, and waited for back-up before continuing to question either. The officer stated that part of the reason for the stop was the defendant's criminal history and unspecified intelligence gathered in an ongoing drug investigation. After laying out the standard above, the *Caldwell* Court looked to the facts just discussed, and then determined "whether the officer's conduct during the traffic stop was sufficiently related to the parking violation." [70] The Court concluded that, because the pat-down and handcuffing were "entirely unrelated to the parking violation and exceeded the proper scope of a traffic stop for a parking violation, at this point that the traffic stop ended and a second, independent investigative detention began." [71] The Court then began a review of the officer's independent justification for the continued detention to determine whether he possessed reasonable suspicion for this second detention. When the officer frisked and handcuffed the defendant, the officer had observed only three relevant

facts: (1) the defendant's movement of his right arm as he pulled over; (2) the defendant's apparent nervousness and perspiration; and (3) the defendant's implausible assertion that he did not know the name of his passenger. [72] Based on the totality of even those circumstances, the Court did not believe that the facts, standing alone, could justify the second detention or the "intrusive measures like the pat-down search and the officer's use of handcuffs." [73]

■ In addition, the Court concluded that the pat-down could not be supported under the State's argument that it was necessary for officer safety. An officer, after a lawful investigative stop supported by reasonable suspicion, has "an absolute right to conduct a limited search of the suspect for dangerous weapons if he has a reasonable belief that the detainee is presently armed and dangerous." [74] However, a claim of "officer safety" is not a panacea. [75] Because the officer in *Caldwell* did not indicate he had any reason to fear for his safety or to believe the defendant posed a risk to other officers, no facts that would justify a reasonable person to believe so existed, and the use of the handcuffs and the pat-down were not justified. [76] Therefore, the Supreme Court concluded that the evidence at issue should have been suppressed pursuant to the federal exclusionary rule. [77] Accordingly, the Superior

70. *Id.* at 1046.

71. *Id.* at 1049.

72. *Id.* at 1050.

73. *Id.*

74. *Id.* at 1051 (citing *Hicks v. State,* 631 A.2d 6, 7 (Del.1993)).

75. *Id.* (citing *Jones v. State,* 745 A.2d at 872 n. 78 ("While officer safety is both legitimate and weighty, it cannot in all circumstances

justify a search or seizure. Otherwise nearly any invasion of a person's privacy could be justified by arguing that the police needed to protect themselves from some harm.")).

76. *Id.*

77. See *Wong Sun v. United States,* 371 U.S. 471, 484–485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Court's denial of the motion to suppress was reversed.

■■■■■ In the present case, Officer Shyres possessed the reasonable suspicion necessary to effectuate the initial traffic stop, because he actually witnessed the Defendant execute a turn without first signaling for at least 300 feet.[78] The question before this Court is the same one before the *Caldwell* Court: "whether the officer's conduct during the traffic stop was sufficiently related to the [traffic] violation." After pulling the Defendant's vehicle over, Officer Shyres approached the car and requested the Defendant's license, registration and insurance; the Defendant could only produce his license. Officer Shyres returned to his vehicle to run the Defendant's license. The Defendant's license was valid, and he had no active warrants. Rather than question the Defendant on his lack of insurance or registration or even issue the Defendant a citation for these traffic offenses, Officer Shyres asked Defendant to exit the vehicle, performed a pat-down, asked questions regarding the Defendant's business abroad, and then had him stand at the rear of his vehicle with Officer Longski. Under 11 Del. C. § 1902 Officer Shyres is empowered to question the Defendant about his "name, address, business abroad, and destination," because the officer had reasonable ground to suspect the Defendant had violated a traffic regulation.[79] Further, under the Fourth Amendment, an officer may order both the driver and the passengers to exit the car during the course of a valid traffic stop.[80] However, because Officer Shyres' actions and stated intent upon returning to the Defendant's vehicle were unrelated to the traffic violation, it becomes clear that at this point the traffic stop ended and a second, independent investigative detention has begun.[81] Therefore, for this Court to uphold the subsequent seizure and search, Officer Shyres must have possessed reasonable articulable suspicion to support his action.

■■■ In response to the Defendant's motion to suppress, the State argued that reasonable suspicion was established by: (1) the Defendant's presence in a "high drug area" of Harrington; (2) the Defendant's bloodshot eyes; (3) the Defendant's illogical and contradictory answers to Shyres questioning; and (4) the presence of several air fresheners in the vehicle. First, as made clear earlier in this opinion, the Delaware Supreme Court has labeled the police claim of a "high drug area" a "familiar mantra,"[82] and has held that reasonable suspicion "cannot be based on a defendant's presence in a particular neighborhood at a particular time of day with no independent evidence that the defendant has committed, is committing or is about to commit a crime."[83] In this case, nei-

---

**78.** Because this part of the opinion is analyzed under the Fourth Amendment and *Whren* controls in such a situation, there is nothing inherently unconstitutional about Officer Shyres' initial stop or his underlying motivation.

**79.** 11 *Del. C.* § 1902.

**80.** *Maryland v. Wilson,* 519 U.S. 408, 412–414, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

**81.** The Defendant's counsel asked Officer Shyres at the suppression hearing, "Your purpose in having [the Defendant] step out of the vehicle at that point was not—didn't have anything to do with a traffic offense, it had to do with continuing your investigation of what you had believed occurred at New Street." Officer Shyres responded, "Correct." Asked if that was accurate, Officer Shyres responded, "That's correct."

**82.** *Caldwell v. State,* 780 A.2d 1037, 1043, n. 1 (Del.2001).

**83.** *Jones,* 745 A.2d at 871.

ther the State nor Officer Shyres presented any evidence at the suppression hearing that supported the blanket statement that this was a high drug area. Furthermore, the Defendant never even entered that purported high drug area. Officer Shyres stated it was restricted to New Street, but the facts show the Defendant proceeded past New Street, turning left on East Street toward Clark Street, exactly as he told Officer Shyres he was going to do.

Second, the State argues that bloodshot eyes combined with an absence of an odor of drugs or alcohol indicated of the Defendant's drug use and helped form the basis for reasonable suspicion. The Court does not believe that this Defendant's bloodshot eyes can be a basis for reasonable suspicion. This is not to say that bloodshot eyes can never be probative of criminal activity. For example, if the Defendant's bloodshot eyes were combined with an odor of drugs or alcohol, a more persuasive argument might exist. However, bloodshot eyes can "result from a variety of non-criminal circumstances, such as tiredness, allergies, or just rubbing of the eyes." [84] When this stop occurred, it was night, and there was no evidence that the Defendant was under the influence of drugs or alcohol. Thus, the State's argument is not convincing.

Third, the State argues that the Defendant's illogical and contradictory statements were part of the reasonable suspicion calculus. However, Officer Shyres did not begin to question the Defendant until after he had ordered him out of the car, and performed a pat-down. While the Defendant's response to these questions may have been illogical, the State's at-

tempt to argue that these statements were part of the reasonable suspicion, necessary to support a subsequent detention, when they were elicited after the subsequent detention began, is similarly specious. Subsequently obtained evidence is not permitted to justify a prior seizure and search. Because this type of evidence is not allowed, those statements cannot be part of the totality of the circumstances supporting the subsequent detention. Additionally, the *Caldwell* Court stated in a footnote that "[m]ost courts require something more than nervousness and implausible or conflicting answers to support a finding of reasonable suspicion—for example, insufficient documentation or the odor of masking agents." [85] While the Defendant was not able to provide Officer Shyres with his insurance card or the vehicle's registration, that does not provide the "something more" necessary to support the subsequent detention, particularly given the presence of his license. Officer Shyres performed a registration check prior to pulling the Defendant over. He already knew the vehicle was properly registered and not reported stolen. Also, the officer was not concerned with the Defendant's lack of insurance or registration; he did not make further inquires into the absence of either, and specifically stated in the suppression hearing that upon his return to Defendant's car, his sole concern was further investigating the Defendant's connection with the warrants he attempted to serve on New Street.

Finally, while Officer Shyres may have been taught that air fresheners can serve as masking agents and can be indicative of drug possession, the Court does not find

84. *Ferris v. State*, 355 Md. 356, 735 A.2d 491, 509 (1999) ("In the absence of any testimony or scientific evidence as to some direct, observable correlation between eyes that are bloodshot and drug usage or drug possession,

[this Court finds] this factor to carry little if any weight.").

85. *Caldwell*, 780 A.2d at 1050 n. 32.

that, in this instance, the presence of a few air fresheners provided sufficient basis, or the "something more" for the subsequent detention. In support of this conclusion, a Maryland case, in which the State argued that the presence of air fresheners contributed to the officer's reasonable suspicion is instructive.

In *Snow v. State*, the state trooper who detained the defendant in that case articulated four reasons why he suspected the defendant was carrying drugs: (1) the defendant seemed nervous and avoided making eye contact; (2) the defendant was traveling along a known drug corridor; (3) three air fresheners hung from the rearview mirror of the defendant's vehicle; and (4) the defendant refused to consent to a search of his vehicle.[86] The Court held that these articulated reasons did not amount to reasonable suspicion as they described a large portion of society.[87] Therefore, the Court concluded that the trooper lacked a legal basis to detain the defendant after the speeding ticket was issued.[88]

In the case at bar, Officer Shyres noted that the Defendant had "several" air fresheners hanging from the handles in the ceiling in the backseat of his car. However, the officer did not take note of how many air fresheners were in the backseat, and also did not note if any were hanging elsewhere in the car. He did not report being overcome by the smell of air fresheners. The mere presence of several air fresheners in the backseat of the Defendant's car is insufficient by itself, to differentiate this Defendant from the large body of innocent air-freshener user drivers, or to lead a reasonable officer to conclude that drug activity was afoot.

■ When determining if an officer possessed reasonable suspicion, a court must weigh that officer's articulated reasons against the totality of the circumstances. However, "it is not enough that the [police] can articulate reasons why they stopped someone, if those reasons are not probative of behavior in which few innocent people would engage—the factors taken together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied."[89] When viewing Officer Shyres's articulated reasons against the totality of the circumstances, and with the case law that has developed around these reasons in mind, the conclusion must be that Officer Shyres lacked the reasonable suspicion necessary to support his subsequent detention of the Defendant. Therefore, the Court finds that the evidence related to drugs obtained was a result of the purely pretextual stop, and the subsequent unjustified detention must be suppressed.

■ The Court notes that the subsequent detention cannot be justified on the grounds that the pat-downs of the Defendant and his passenger were necessary for officer safety. Earlier in this opinion, the Court referenced the standard set out in *Caldwell* for a valid pat down. As noted previously, a claim of "officer safety" is not talismanic. While, after a lawful investigative stop supported by reasonable suspicion, an officer has "a right to

---

86. *Snow v. State*, 84 Md.App. 243, 578 A.2d 816, 824 (Spec.App.1989).

87. *Id.* at 825.

88. *Id.*

89. *Karnes v. Skrutski*, 62 F.3d 485, 493 (3rd Cir.1995).

conduct a limited search of the suspect for dangerous weapons," the officer must possess a reasonable belief that the detainee is presently armed and dangerous.[90] The reasonable belief or suspicion must be directed at the person to be frisked.[91] Simply "allowing pat down searches ... as a matter of routine practice, without other attendant circumstances, would eviscerate Terry's requirement that the pat down be based on particularized suspicion developed by the officer with respect to each individual suspect."[92] Officer Shyres cannot meet the standard laid out in Caldwell, for he cannot articulate any reasons that led him to believe that either the Defendant or his passenger was armed. In fact, Officer Shyres testified both at the preliminary hearing and at the suppression hearing that he never had any reason to believe that the Defendant or his passenger possessed any weapon. Officer Shyres's sole basis for the pat down was that it was his habit automatically to conduct a pat down of a subject when he is going to question him. The case law is clear that pat downs must be supported by some reasonable suspicion, rather than mere habit. Therefore, not only did Officer Shyres lack reasonable suspicion for the subsequent detention, but also he cannot justify the pat down and detention on the grounds of officer safety. Again, the Court concludes that the evidence at issue must be suppressed.

## G. The Defendant's Consent to the Vehicle Search Does Not Validate the Stop.

■■■■ Finally, the Defendant argues that his consent to a search of his vehicle by the Harrington Police cannot serve to cure Officer Shyres' lack of reasonable suspicion for the subsequent detention. The State did not provide argument on this point. Regardless, our courts hold that "a search conducted pursuant to a valid consent is an exception to the requirement of a warrant and probable cause."[93] Valid consent exists where "the consent to search is voluntary, which is a question of fact to be determined from the totality of the circumstances."[94] Where a person who is illegally detained gives the consent, that search is deemed tainted by that illegality, and is ineffective to justify the resulting search.[95] Therefore, "unless the consent has been purged of the taint of the illegal seizure," it is not valid.[96] In the present case, the Court has already concluded that the seizure of the Defendant was unlawful. Consequently, the consent, given shortly after the unjustified seizure, and without some intervening circumstance to purge the taint, is invalid, and the drugs obtained as a result of the illegal seizure and search of the Defendant's vehicle must be suppressed.

## III. Conclusion

For the reasons stated above the Defendant's Motion to Suppress the evidence

**90.** *Caldwell*, 780 A.2d at 1051 (citing *Hicks v. State*, 631 A.2d 6, 7 (Del.1993)).

**91.** *State v. Dollard*, 788 A.2d 1283, 1289 (Del.Super.2001) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)).

**92.** *Id.*

**93.** *State v. Huntley*, 777 A.2d 249, 257 (Del.Super.2000) (citing *Schneckloth v. Busta-*

*monte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and *State v. Morris*, 1997 WL 363938, at *4 (Del.Super.1997)).

**94.** *Id.* (citing *Bustamonte*, 412 U.S at 227, 93 S.Ct. 2041).

**95.** *Id.* (citing *Morris*, 1997 WL 363938, at *4).

**96.** *Id.* (citing *State v. Wrightson*, 391 A.2d 227, 229 (Del.Super.1978)).

obtained from the search conducted on April 10, 2006 is GRANTED.

SO ORDERED.